## LITTLEFIELD *v*. PERRY.

1. Where one instrument, duly recorded in the Patent Office, contains in unmistakable language, an absolute conveyance by a patentee of his patent and inventions described (in this case applications of a principle of heating furnaces for houses, heating stoves, steam boilers, &c.), and all improvements thereon, within and throughout certain States, and an agreement by the assignee to pay a royalty on all patented articles sold, with a clause of forfeiture in case of non-payment, or neglect, after due notice, to make and sell the patented articles to the extent of a reasonable demand therefor, the grantee will not, by an agreement supplementary to such assignment and of even date but not recorded, be reduced into a mere licensee as respects a right to sue in the Federal courts, for infringement within the assigned territory, by the fact that in the supplementary agreement the parties declare that nothing in the grant shall give the assignee the right to apply the principle of the invention to one special purpose (in this case to the heating of several rooms in a house by furnaces erected in the cellar), "the same being intended to be reserved" by the patentee. And this is so, although the supplementary and unrecorded agreement be referred to in the recorded one. The reservation will be regarded as the grant back of a mere license from the assignee to the patentee.

2. Such grantee, or one claiming under him, may accordingly, as assignee, under the Patent Acts, sue in the Federal courts to prevent an infringement upon his right.

---

* Strang *v*. New York Rubber Co., 1 Sweeny, 86, 87.

3. Even though this were not so, and he not technically an *assignee,* such a grantee may, under the Patent Act. which provides "that all actions, suits, controversies, and cases arising under any law of the United States granting or confirming to inventors the exclusive right to their inventions or discoveries shall be originally cognizable, as well in equity as at law, in the Circuit Courts, &c.," maintain a suit in his own name in the Federal court against the patentee, alleged to infringe. He has the exclusive right to the use of the patent for certain purposes within a defined territory, and so holds a right under the patent. Alleging infringement, a ·construction of the patent is involved; this raises a question "under" the "law." That such a suit may involve the construction of a contract as well as of the patent, will not oust the court of its jurisdiction. If the patent is involved it carries with it the whole case.

4. *Semble.* Where the patentee himself is infringing the rights of his own licensee, and the licensee (not being able to sue the patentee in the usual way in which a licensee sues an infringer, *i. e.,* in the patentee's name) is remediless so far as the Federal courts are concerned, unless he can sue in his own name—he may so sue in equity, which regards substance and not form. The cases of strangers and the patentee himself distinguished in the category of infringement.

5. Where assignees of a patent grant to A , and afterwards, not regarding that grant, grant, though without warranty, to B., if A. reconvey to them, B. has the right by estoppel against his grantors.

6. Where a person had a patent for " a coal-burner so constructed as to produce combustion of the inflammable gases of anthracite coals," and had also a pending application for another improvement in stoves, devised " for the purpose of economizing and burning the gases generated by the combustion of anthracite coals ;" and afterwards executed a grant, which (after reciting that he held a patent " for a coal-burner so constructed as to produce combustion of the inflammable gases of anthracite coals," and that he had " made application for letters-patent securing to him a certain *improvement* in the invention *so as aforesaid patented to him* "), then proceeded to assign all the right, title, and interest which he then had, or might thereafter have, "in or to the aforesaid inventions, improvement, and patent, or the patent or patents that may be granted for said inventions or any *improvement therein*"—he will not be allowed—on his beforementioned "application" being rejected, and on his getting subsequently to the date of the grant and of the rejection, a patent for an improvement in stoves, so devised as "to burn the gaseous and more inflammable elements of the coal in contact with its more refractory portions, and thus secure a more complete combustion of them both," which his grantee asserts to be for the same thing essentially as was the rejected application, and so to have passed under the grant—to deny that the application was for an "improvement" on the first patent. He is estopped by his grant describing it as an improvement on the first patent, to do so. Accordingly, if the second patent be, in view of the court, for essentially the same thing as was the re-

jected application, it passes under the assignment as an "improvement" on the first patent.

7. Where a patentee is himself the infringer of rights under the patent which he has assigned, equity looks upon him as a trustee faithless to his trust; the violator of rights which he was bound to protect. It will accordingly charge him for all profits improperly made, as well for profits on original patents, the subject of original bill, as for profits made on reissues obtained *pendente lite,* and the subject of a supplemental bill.

8. Where the suit is for infringing patents for certain improvement in coal-stoves—coal-stoves generally and various improvements on them being long known—and the decretal order directs an account of all the profits which the defendants have received from the manufacture, use, or sale "of *stoves, &c., embracing the improvements described in* and covered by the said letters-patent and the reissues thereof, or any of them," the order is too broad. The true rule is stated in *Mowry* v. *Whitney* (14 Wallace, 620), where it was held that the question to be determined in such a case is, "What advantage did the defendant derive from using the complainant's invention over what he had in using other processes then open to the public, and adequate to enable him to obtain an equally beneficial result?" and that the fruits of *that* advantage are his profits, and to be accounted for.

9. As a general thing, interest on profits is not allowable. Profits actually realized are usually the measure of unliquidated damages. Circumstances, however, justify the addition of interest.

APPEAL from the Circuit Court for the Northern District of New York; the case being thus:

On the 5th of April, 1853, Dennis Littlefield, of New York, being at the time the patentee under a patent issued April 15th, 1851, for "a coal-burner so constructed as to produce combustion of the inflammable gases of anthracite coals," and having then on file in the Patent Office an application, dated December 30th, 1852, for a patent securing to him a stove arranged and operating "for the purpose of economizing and burning the gases generated during the combustion of anthracite and other coals"—and the applicant stating that it was his purpose to apply it "*to furnaces for heating buildings,* to cooking-stoves or ranges, to the furnaces of locomotives, or in any other situation where it is an object to economize waste gases or to consume smoke"—entered, as a party of the first part, into an agreement—evidenced by two separate documents, the first styled in some

of the pleadings in the case, " a grant," and the second " a supplementary agreement"—with the firm of Treadwell & Perry (*to whom he then owed the sum of $1500*) as a party of the second part, concerning the subjects, &c., embraced in the patent.    The " grant" was thus:

" Whereas letters-patent have been granted to and are now held by the said party of the first part, for a coal-burner so constructed as to produce combustion of the inflammable gases of anthracite coal, which letters bear date the 15th of April, 1851. And whereas, the said party of the first part has made application to the Patent Office for letters-patent, securing to him a certain *improvement* in the invention so as aforesaid patented by him, and said application is now pending; therefore, the said party of the first part, in consideration of one dollar to him in hand paid by said parties of the second part, and of the agreements herein contained on the part of said parties of the second part, and of the agreements contained *in a certain agreement this day executed between the parties hereto, and bearing even date herewith,* hath and by these presents *doth assign and transfer* to the said parties of the second part, their executors, administrators, and assigns, all the right, title, and interest which the said party of the first part now has, or can or may hereafter have in or to the aforesaid inventions, *improvement,* and patent, or the patent or patents that may be granted for said inventions, *or any improvements therein,* and on any extension or extensions thereof within and throughout the territory embraced within the States of New York and Connecticut, for and during the term for which the aforesaid letters-patent were granted, and the terms for which any patent for the aforesaid improvement, and *any other improvement or improvements thereof,* or extensions for or of either thereof, may be granted.    And the said party of the first part doth hereby, for himself, his heirs, executors, and administrators, guaranty to the said parties of the second part the full and uninterrupted enjoyment of the use and right to use, to make, construct, and to vend to others to use, the inventions, improvements, and patents aforesaid, during the terms aforesaid, as against all other persons whomsoever within the territory aforesaid.

" And the said parties of the second part hereby agree to pay unto the said party of the first part, for the right and interest

hereby *assigned and conveyed*, provided, and as long as said party of the first part shall well and faithfully keep and perform all the agreements herein, and in the aforesaid agreement this day executed, between the parties hereto, the sum of fifty cents on each and every stove or coal-burner embracing said inventions and improvements hereby assigned, which shall be sold by said parties of the second part, after they shall have sold fifteen hundred of said stoves or coal-burners; such payments to be made at the times and in the manner particularly specified in the aforesaid agreement this day executed between the parties hereto.

"It is expressly understood and agreed between the said parties, that in case said party of the first part shall well and faithfully keep and perform all the agreements herein and in the aforesaid agreement, bearing even date herewith, contained, on his part, and the said parties of the second part, their executors, administrators, and assigns, shall without just cause refuse, or shall neglect to make and sell said coal-burners to such extent as the demand therefor shall reasonably warrant and require, *after reasonable notice shall be given to them by said party of the first part, requiring them so to make and sell the same*, that this assignment and transfer shall thereafter be void and of no effect, and all the rights and interests herein and hereby conveyed shall thereupon revert to the said party of the first part, his executors, administrators, and assigns."

The "supplementary agreement," dated like the other, on the 5th of April, 1853, and like the other, with Littlefield, the patentee, for a party of the first part, and Treadwell & Perry, the assignees, party of the second part, was thus:

"Whereas, the said party of the first part hath agreed to sell, *assign and transfer* unto said parties of the second part, all the right, title, and interest which said party of the first part now has, or can or may hereafter have, in or to certain letters-patent of the United States, granted to him on the 15th of April, 1851, and the invention thereby patented, and to a certain improvement thereon, an application for a patent for which is now pending, and to any and all extensions thereof, within the States of New York and Connecticut, upon certain conditions and stip-

ulations. And whereas said party of the first part is now indebted to the said parties of the second part in about the sum of $1500, and it is understood and agreed between the parties hereto that the premium of fifty cents upon each stove embracing said invention and improvements of said party of the first part which shall be sold by said parties of the second part, shall be retained by them until they have sold fifteen hundred of said stoves, and applied upon the aforesaid indebtedness of said party of the first part to them. Now, in consideration of the premises, the said parties to this agreement hereby mutually agree to and with each other as follows, to wit:

"The said party of the first part hereby agrees—

"1. That in case any suit or proceeding shall be commenced against the said parties of the second part, or any persons holding under them, affecting the validity of said letters-patent, or either of them, or for violating any previous patent by the use and enjoyment of the rights, interests, and privileges conveyed to said parties of the second part, by an *assignment* this day made to them by said party of the first part, or any alleged infringement of any other patent, he will . . . assume and conduct at his own cost the defence against all such suits and proceedings, and keep and save entirely harmless and indemnified the said parties of the second part, their executors, administrators, and assigns, of and from all damages, costs, and expenses on account of the same; and further, that he will, whenever required by said parties of the second part or their assigns, sue any and all persons who shall infringe or violate, within the States of New York or Connecticut the said patent, or *any patent or patents which may hereafter be obtained in respect to the subject-matter thereof*, or of either of the same, in his own name or otherwise, but at his own cost or charge, and shall conduct the same for the use and benefit of said parties of the second part, their executors, administrators, and assigns; and he further agrees that in case the said letters-patent already granted, or any patents which may hereafter be obtained by him as aforesaid for the subject-matter thereof, shall be adjudged invalid, so as to deprive the said parties of the second part of the use and enjoyment of the rights and interests conveyed by the aforesaid assignment, that the agreements therein and herein contained on the part of said parties of the second part shall thereupon

become void and of no further effect as against them or their assigns.

"2. That he will furnish to the said parties of the second part, before the first day of August next, at the cost price thereof, at the furnace of said parties of the second part, undressed cast-iron patterns for four several sizes of the coal-burner, patented in and by the aforesaid letters-patent, and *embracing all the improvements therein for which letters patent shall then have been secured,* suitable to mould and cast from, and that he also will furnish at the place and price aforesaid, within a reasonable time after letters-patent have been secured by him therefor, undressed cast-iron patterns of the several sizes of all improvements upon said coal-burners which shall be made or invented by him.

"3. That he will pay the balance of the said indebtedness to said parties of the second part, over and above the said sum of $750, in monthly instalments, from this date, of not less than $100.

"The said parties of the second part hereby agree—

"1. That so long as the said party of the first part shall well and faithfully keep and perform all the agreements herein, and in said assignment bearing even date herewith, contained on his part, the premium of fifty cents upon each stove or coal-burner embracing the aforesaid inventions and improvements, which shall be sold by them, shall be retained and applied by them toward the payment of the said indebtedness of said party of the first part to them, to the extent and amount of $750, and that after such amount shall have been thus paid they will pay to said party of the first part, his executors, administrators, or assigns, the premium or sum of fifty cents on each and every of said stoves or coal-burners which shall thereafter be sold by them; that they will keep a true account of all sales of said stoves or burners, which shall be open to the examination of the said party of the first part, and that a settlement of and for the premiums on said sales shall be made by them with said party of the first part, on the first day of April in each and every year hereafter.

"2. That they will also pay, in the manner and at the times aforesaid, the sum or premium of fifty cents upon every stove or burner, furnace, range, oven, or heater, of whatever kind or

description that they may originate or construct upon the principle of the coal-burner, so patented as aforesaid, by said party of the first part, after patterns of their own design or contrivance, *it being, however, hereby expressly understood and agreed by said parties of the second part, that nothing herein or in said assignment contained shall give to them the right to use or apply the principle of said coal-burner to furnaces that are used or erected in the cellars or basements of houses, for the purpose of heating several rooms or larger part of a dwelling-house, the same being intended to be reserved by said party of the first part.*

"3. That they will, in case the said party of the first part shall well and truly keep and perform all the agreements on his part herein and in said assignment contained, manufacture and use all reasonable efforts to sell so many of said stoves or burners as the demand therefor will reasonably warrant and require; and that in case they or their assigns shall, without just cause, refuse, or *after reasonable notice* from said party of the first part, shall neglect to manufacture or sell said stoves or burners to such extent as aforesaid, then that the aforesaid assignment shall become inoperative and void, and this agreement shall cease and be of no further effect. But in that event, it is expressly understood and agreed that in case the said indebtedness of said party of the first part shall not then have been fully paid or satisfied to said parties of the second part, the same shall thereupon be at once due and payable, and that the payment thereof may be required by them from said party of the first part; provided, however, that such refusal or neglect shall occur for the reason that said stoves or burners cannot be sold by said parties of the second part on account of some practical defect in the principle thereof."

The first of these two agreements, the grant, was duly recorded in the Patent Office, April 11th, 1853. The second, or supplementary agreement, was never recorded.

The application of Littlefield, dated December 30th, 1852, for an improvement in his first invention, and mentioned in the two documents, was rejected by the Patent Office, and on the 23d July, 1853, withdrawn by him.

On the same day that he thus withdrew it he filed a second application, it being for "a new and useful improvement in stoves," so devised as "to burn the gaseous or more inflam-

mable elements of the coal in contact with its more refractory portions, and thus secure a complete combustion of them both."

The specification of this application, like that of the application rejected and withdrawn, stated that the patentee did not purpose to limit it to stoves for heating purposes alone, but to employ it wherever it could be advantageously applied, particularly to *house furnaces,* cooking-ranges, steamboat boilers, and stoves.

Upon this application a patent was issued, January 20th, 1854. On the 27th June, 1861, a patent for an improvement on this patent of 1854 was granted; and on the 9th November, of the same year, a reissue. Numerous other patents outstanding, and the subject of this controversy, were admitted to be reissues of this patent of 1854 or of patents for improvements upon it.

In this state of things, Treadwell & Perry, on the 25th of March, 1862, assigned *all their interest* to a certain George W. Sterling. He becoming dissatisfied with his purchase, the sale, by agreement, was cancelled, and he executed, June 2d, 1862, a reassignment to Treadwell & Perry. Intermediately, however, that is to say, on the 7th April, 1862, Treadwell & Perry had executed an assignment without any warranty of ownership to one Dickey. Both the reassignment from Sterling and the assignment to Dickey were left at the Patent Office for record on the 26th of June, 1862, and on the 2d July Dickey assigned all his interest to Mrs. Mary J. Perry, wife of John S. Perry; the Perry of the firm of Treadwell & Perry.

Littlefield having entered into partnership with one Jagger, and they two being engaged in making, within the States of New York and Connecticut, stoves under the patents of 15th April, 1851, 20th January, 1854, and June 27th, 1861, and under the patents for improvements on the inventions therein patented, and under the reissues of these several patents, Mrs. Perry, *on the 27th of August,* 1862,—alleging that the invention secured by the patent of April

15th, 1851, was regarded by Littlefield "only as a germ from which a more valuable construction was to arise," and that with a view of enhancing its value and utility he had proceeded soon afterwards with various experiments for improving the inventions secured by that patent, and that the subsequent patents and reissues were but for improvements on the original one, which subsequent improvements, with the original one, had passed to Treadwell & Perry by the "grant,"—filed a bill in the court below against Littlefield & Jagger for injunction and account. Other improvements were patented, and reissues made pending the suit. Mrs. Perry having died during the suit, her husband, who was trustee under her will, was substituted as complainant. All the parties—complainant and defendants alike—were citizens of the State of New York. A supplemental bill filed after the date of reissues claimed the profits under them.

The assignment above mentioned of April 7th, 1862, to Dickey, was executed by Perry. Treadwell, in testimony, swore, more than once, that he assented to it.

For the benefit of the reader who may not recall the exact words of the Patent Acts, and the exact construction given to them, it may be well here to state—

1st. That one of the Patent Acts enacts as follows:*

"Every patent shall be assignable in law either *as to the whole interest or any undivided part thereof*, by any instrument in writing; which assignment, and also every grant and conveyance of the exclusive right under any patent to make and use and to grant to others to make and use, the thing patented *within and throughout any specified part or portion of the United States*, shall be recorded in the Patent Office within three months from the execution thereof.

"All actions, suits, controversies, and cases arising under any law of the United States, granting or confirming to inventors the exclusive right to their inventions or discoveries, shall be

---

* Patent Act of July 4th, 1836, 5 Stat. at Large, 121, §§ 11 and 17. The Patent Act of 1870, § 36, is to the same effect. And see R. S. U. S., § 4898.

originally cognizable, as well in equity as at law, by the Circuit Courts of the United States, or any District Court having the powers and jurisdiction of a Circuit Court."

2d. That under the first of the above-cited sections, it has been judicially held* that the patent is assignable only

(*a*) As to the whole interest, or an undivided part of such whole interest in every portion of the United States, OR

(*b*) As to an exclusive right within and throughout some specified part of the United States.

And that under the second of the above-cited sections, an assignee, either of the entire interest or of the exclusive right within a specified portion of the United States, may sue, in his own name, infringers in the Federal courts.

And that it has been further decided† that a mere licensee cannot so sue, and that whenever a contract is made in reference to patent rights, which is *not* provided for or regulated by the preceding or other statute of the United States, the parties, if a dispute arise, stand as regards their right to sue in the Federal courts and otherwise, upon the same ground as other litigants.

The defendant accordingly set up either in answer or argument various defences—as,

I. That the grant and the supplemental agreement were one agreement; the latter being referred to in and making part of the former. That in consequence of the limitation and reservation made in the supplemental agreement (*supra*, p. 212), the right to use or apply the invention patented or applied for, given in the grant, was never given as to part of the invention, the part, namely, which applied " to furnaces that are used or erected in the cellars or basements of houses for the purpose of heating several rooms or larger part of a dwelling-house; the same, continued the supplementary agreement, being intended to be reserved." That neither

---

* Blanchard *v.* Eldridge, 1 Wallace, Jr. 339; Brooks *v.* Byam, 2 Story, 525; Gayler *v.* Wilder, 10 Howard, 495; Potter *v.* Holland, 1 Fisher, 333.

† Wilson *v.* Sandford, 10 Howard, 102; Goodyear & Judson *v.* India-rubber Company, 4 Blatchford, 63; Suydam *v.* Day, 2 Id. 20.

the whole invention nor any undivided part of it being thus transferred, Treadwell & Perry were, under the above-quoted statute, which "renders the monopoly capable of subdivision in the category of its locality, but in no other way,"* not invested with such a title, as under the acts of Congress would give them a right to sue in the Federal courts; that the assignee must have the entire right within the territory specified; that they were mere licensees and unable under the Patent Acts to maintain a suit in their own name, or to give another this right; that accordingly no jurisdiction under the statute existed in the Circuit Courts to hear the case, both complainant and defendants being citizens of the same State.

II. That the fact that the contract between the parties did not vest in Treadwell & Perry any exclusive right in, or legal title to, or equitable right to perfect a title to any patent or invention, nor confer any right beyond that of licensees, appeared further, under decisions of the Federal courts, for the following reasons:

Because it was stipulated that the patentee should sue all infringers "in his own name," or otherwise; showing the intent of the patentee to retain the control of the patents. .

Because he reserved a premium or royalty on each stove to be manufactured by Treadwell & Perry.

Because Treadwell & Perry were required to account to him in a particular manner for all stoves made and sold by them.

Because there was a provision by which the contract might become "inoperative and void," and by which "all the rights and interests . . . conveyed" were to "revert" to the patentee, in the event that Treadwell & Perry neglected and refused to make and sell the stoves mentioned.

III. That the title was in Treadwell & Perry, inasmuch as Sterling, previously invested by them with a title, reassigned to them after they had assigned to Dickey, the argument here being that there was no actual warranty in the transfer

---

* Blanchard *v.* Eldridge, 1 Wallace, Jr. 337.

to Dickey and none to be implied; that the transfer was in fact but a quit-claim, and that it was settled law that,

"If a possessor, without title, convey by quit-claim deed, and afterwards acquire good title, it does not inure to the benefit of the grantee."*

IV. That the inventions which Littlefield & Jagger were using, were inventions under the patent of 1854, or reissues of it, or for improvements on inventions *thus* secured; and that the patent of 1854 was not for any "improvement" upon the invention of the patent of 1851, or on the invention described in the application of 1852, or improvement of it, or reissues for either; the things alone transferred by the "grant."

[On this question of fact the defendants went into a great body of proof, exhibiting in court models of all the things at any time applied for, patented, or secured by reissues, with a great amount of parol evidence to show that the inventions which *they* were using were not "improvements" on anything which had passed by the grant or supplementary agreement of 1852, but were essentially different inventions.]

V. That no rights now existed in the complainant, inasmuch as Treadwell & Perry had forfeited whatever rights the grant gave them, by not making and selling stoves as they had stipulated by the agreement to do.

[On this point some proofs were given, but it was not shown that Littlefield had given to them the notice required by the supplementary agreement, *supra*, p. 212.]

VI. That the supplemental bill, claiming the profits under the last reissues, extinguished and cancelled all claims for infringement of the original and prior reissues, since suits pending for the infringement of an original patent fall with its surrender for a reissue, because the foundation upon which they rest no longer exists.† And that this cannot be helped by a supplemental bill.

---

* Jackson *v.* Hubble, 1 Cowen, 613.
† Moffitt *v.* Garr, 1 Black, 273.

The court having heard the case, directed an account of "all the profits, gains, and advantages which the said defendants, or either of them, have received, or which have arisen or accrued to them, or either of them, from the manufacture, use, or sale of stoves within the States of New York and Connecticut, embracing the improvements described in and covered by the said letters-patent, and the reissues thereof, or any of them."

The master, stating an account on these principles, found due to the complainants as of December 6th, 1869, the sum of $52,747, the defendant giving little assistance in enabling him to arrive at the truth of things; and the court, overruling numerous exceptions to the report, some of form and some to the principles on which the account was stated, and approving it, added interest to the date of final decree; entering then, March 19th, 1872, a decree for $61,486.

From that decree, John S. Perry, who, by substitution in the course of the proceeding, had, as already said, become complainant as trustee and executor of his wife, Mary, the original complainant, appealed.

*Messrs. E. R. Hoar and H. E. Sickles, for the appellants; Messrs. E. W. Stoughton and J. H. Reynolds, contra.*

The CHIEF JUSTICE delivered the opinion of the court.

We are met at the outset of this case with a question of jurisdiction. All the parties, plaintiff as well as defendant, are citizens of the State of New York. The power of the Circuit Court, therefore, to entertain the cause, if it exists at all, must be found in the jurisdiction conferred by the patent laws.

The suit is in equity against a patentee by one who claims to be his assignee, to restrain him from infringing upon rights under his patent, which are alleged to have been assigned. The Circuit Court has jurisdiction of all suits arising under the patent laws, and has power, upon a bill in equity filed by a party aggrieved, to grant injunctions, according to the course and principles of courts of equity, to

prevent the violation of any right secured by patent. Every patent, or any interest therein, is by statute made assignable by an instrument in writing, and the patentee or his assignee may, in like manner, grant and convey an exclusive right under his patent throughout any specified part of the United States. All such assignments must be recorded in the Patent Office within three months from the time of their execution. This power of assignment has been so construed by the courts as to confine it to the transfer of an entire patent, an undivided part thereof, or the entire interest of the patentee or undivided part thereof within and throughout a certain specified portion of the United States. One holding such an assignment is an assignee within the meaning of the statute, and may prosecute in the Circuit Court any action that may be necessary for the protection of his rights under the patent.

The title of the complainant in this case grows out of what is termed in the answers " a grant and supplementary agreement," executed in "two parts," between Littlefield, the patentee, and Treadwell & Perry. The "grant" is one of the parts, and the "supplementary agreement" the other. The grant, taken by itself, contains, in most unmistakable language, an absolute conveyance by the patentee of his patent and inventions described, and all improvements thereon, within and throughout the States of New York and Connecticut, and an agreement by the assignees to pay a royalty on all patented articles sold, with a clause of forfeiture in case of non-payment or neglect, after due notice, to make and sell the patented articles to the extent of a reasonable demand therefor. This grant was duly recorded in the Patent Office six days after its execution.

The supplementary agreement was never recorded. It contained, among other things, a stipulation to the effect that nothing in the assignment should give to Treadwell & Perry the right to use or apply the principle of the patent to furnaces erected in cellars or basements of houses for the purpose of heating several rooms, it being the intention of the patentee to reserve that to himself. It also contained

certain other stipulations between the parties intended for the protection of their respective rights and the regulation of their conduct under the assignment. The defendants now contend that by reason of this reservation, and these several stipulations, the title of Treadwell & Perry, under the grant, has been reduced from that of assignees to mere licensees.

Undoubtedly, for the purpose of ascertaining the intention of the parties in making their contract, the two instruments, executed as they were at the same time, and each referring to the other, are to be construed together. If, when so construed, they shall be found to convey to the assignees the title to the patent and inventions and grant a license back from the assignees to the patentee of the right to use the patent and its principle in the manufacture of the designated furnaces, the Circuit Court had jurisdiction of the cause.

When the "grant" was placed on record, Treadwell & Perry became the apparent owners of the entire patent and inventions throughout the specified territory. Neither the agreement to account and pay the royalty nor the clause of forfeiture for non-performance contained in that instrument reduced them to the position of licensees. The agreement to account and pay formed part of the consideration of the assignment, and was in effect an agreement to pay at a future time a sum to be determined by the number of articles made and sold. For the non-payment or other non-performance a forfeiture might be enforced as for condition broken, but until it was enforced the title granted remained in the assignees.

The supplementary agreement contained a provision that Littlefield should sue infringers " in his own name or otherwise," and also defend all suits against Treadwell & Perry for alleged infringements of other patents by the use of his, and this it is alleged is evidence of the intention of the parties to make the grant effective only as a license. It needs only a slight examination of that clause in the contract, however, to become satisfied that it was intended only as a provision for placing on Littlefield the costs and expenses

of all such litigation, as well as all damages for infringements growing out of the use of the inventions by the assignees. The suits were to be prosecuted in his name, or otherwise, as circumstances should require, and he was to be at all the costs and expense of maintaining his patents. That is the extent of the provision.

Upon the argument, the reservation of the right to use the principle of the patent and inventions in the manufacture of furnaces seemed to be relied upon with more confidence as establishing this claim on the part of the defendants. All agree that the intention of the parties, when ascertained by an examination of both the instruments, must govern in this action where only the parties themselves are interested. There are no intervening innocent third persons. Jagger, the partner of Littlefield, who is codefendant with him, is charged with full notice of the rights of Treadwell & Perry, and others claiming under them.

It is a significant fact that the agreement was executed in two parts. Ordinarily the whole of such a contract is embodied in a single instrument. Another important fact is, that only one of the parts is recorded, and that the one which, taken by itself, places the title in Treadwell & Perry. The record is intended for the benefit of the public. *Bonâ fide* purchasers look to it for their protection. The record of the grant alone, therefore, furnishes the strongest evidence of the intention of the parties to give effect to the two instruments as an assignment. It is true that in the recorded part reference is made to the other, but the manner of the reference is not such as to indicate that the unrecorded part contained anything to defeat the title granted by that which was recorded. The language is, "in consideration of one dollar, and of the agreements herein contained on the part of the parties of the second part, and of the agreements contained in a certain agreement this day executed between the parties hereto, and bearing even date herewith, hath, and by these presents doth, assign," &c. And again : "It is expressly understood and agreed between the said parties that in case said party of the first part shall

well and faithfully keep and perform all the agreements herein, and in the aforesaid agreement bearing even date herewith contained, and said parties of the second part shall, &c., neglect, &c., that this assignment and transfer shall thereafter be void and of no effect," &c. This is undoubtedly sufficient to charge purchasers with notice of the execution of the supplementary agreement, and possibly of its provisions, but it falls far short of indicating an intention of the parties, by anything contained in the unrecorded instrument, to limit or defeat the assignment made in consideration of it. The most that can be inferred from such language is, that the parties had stipulated between themselves, not as to the legal effect of the recorded instrument, but as to their obligations or equitable rights under it. We think, therefore, that Treadwell & Perry were the assignees of Littlefield within the meaning of the patent laws, and that they and those claiming under them may sue in the Circuit Courts to prevent an infringement upon their rights.

But even if they are not technically assignees, we think this action is, nevertheless, maintainable. They certainly had the exclusive right to the use of the patent for certain purposes within their territory. They thus held a right under the patent. The claim is that this right has been infringed. To determine the suit, therefore, it is necessary to inquire whether there has been an infringement, and that involves a construction of the patents. The act of Congress provides "that all actions, suits, controversies, and cases arising under any law of the United States granting or confirming to inventors the exclusive right to their inventions or discoveries shall be originally cognizable, as well in equity as at law, in the Circuit Courts," &c. An action which raises a question of infringement is an action arising " under the law," and one who has the right to sue for the infringement may sue in the Circuit Court. Such a suit may involve the construction of a contract as well as the patent, but that will not oust the court of its jurisdiction. If the patent is involved it carries with it the whole case.

A mere licensee cannot sue strangers who infringe. In such case redress is obtained through or in the name of the patentee or his assignee. Here, however, the patentee is the infringer, and as he cannot sue himself, the licensee is powerless, so far as the courts of the United States are concerned, unless he can sue in his own name. A court of equity looks to substance rather than form. When it has jurisdiction of parties it grants the appropriate relief without regard to whether they come as plaintiff or defendant. In this case the person who should have protected the plaintiff against all infringements has become himself the infringer. He held the legal title to his patent in trust for his licensees. He has been faithless to his trust, and courts of equity are always open for the redress of such a wrong. This wrong is an infringement. Its redress involves a suit, therefore, arising under the patent laws, and of that suit the Circuit Court has jurisdiction.

It is next asserted that the complainant has not by his proof shown himself to be the assignee of Treadwell & Perry. They, on the 25th of March, 1862, assigned all their interest to George W. Sterling. He became dissatisfied with his purchase, and, by agreement of parties, the sale was cancelled, he giving effect to the cancellation by executing a reassignment to Treadwell & Perry, bearing date June 2d, 1862. Under date of April 7th, 1862, Treadwell & Perry executed another assignment to one Dickey. Both the reassignment from Sterling and the assignment to Dickey were left at the Patent Office for record on the 26th June, 1862, and on the 2d July Dickey assigned to Mary J. Perry, in whose name the suit was commenced.

It is now claimed that this proof shows title in Treadwell & Perry, inasmuch as Sterling reassigned to them after they had assigned to Dickey. Mrs. Perry was the wife of John S. Perry, one of the firm, and he is now a party to the suit, having upon her death succeeded to all her rights, as trustee under her will. Treadwell, the other member of the firm, has been several times in the progress of the cause examined

as a witness, and has testified that Dickey became the owner of the patents under a transfer to which he consented. It is clear, therefore, that Mrs. Perry at the commencement of the action was in equity, if not in law, the owner of whatever had been assigned by Littlefield, and that if Treadwell & Perry had the legal title, they held it in trust for her, and will be estopped by a decree in her favor from setting up as against Littlefield any beneficial interest under it. At an earlier stage of the proceedings it might have been proper to make. Treadwell a party, but upon the case as it now stands no possible harm can result to the defendants from a decree against them in his absence.

This brings us to a consideration of the merits of the case.

On the 15th April, 1851, a patent was issued to Littlefield for a certain improvement in cooking-stoves, and on the 30th December, 1852, he filed in the Patent Office his application for another improvement in stoves, devised "for the purpose of economizing and burning the gases generated by the combustion of anthracite coals." On the 5th April, 1853, he executed the grant and supplementary agreement already referred to. In the grant, after reciting that he held a patent bearing date April 15th, 1851, "for a coal-burner so constructed as to produce combustion of the inflammable gases of anthracite coals," and that he had "made application to the Patent Office at Washington for letters-patent securing to him a certain improvement in the invention so as aforesaid patented to him," and that such application was then pending, he proceeded to assign all the right, title, and interest which he then had, or might thereafter have, "in or to the aforesaid inventions, improvement, and patent, or the patent or patents that may be granted for said inventions or any improvement therein, and on any extension or extensions thereof within and throughout the district, &c., for and during the term for which the aforesaid letters-patent were granted, and the terms for which any patent for the aforesaid improvement or any improvement or improvements thereof may be granted," &c. The application of

December 30th, 1852, was rejected at the Patent Office, and finally withdrawn by Littlefield on the 22d day of July, 1853, he at the same time filing another application for " a new and useful improvement in stoves," so devised as " to burn the gaseous or more inflammable elements of the coal in contact with its more refractory portions, and thus secure a complete combustion of them both." Upon this application a patent was issued January 20th, 1854. All the patents outstanding, and the subject of this controversy, are admitted to be reissues of this or improvements upon it. Littlefield and his codefendant do not deny that they have used the patents issued after January, 1854, and if the title to them passed under the assignment of April, 1853, it is admitted that such use is an infringement and that the complainant is entitled to a decree. The simple question, then, presented for our consideration is as to the effect to be given to this assignment.

It is well settled that a recorded assignment of a perfected invention, made before a patent has issued, carries with it the patent when issued,* and that reissues are not patents for new inventions, but amendments of old patents. If a reissue is obtained with the consent of an assignee, it inures at once to his benefit; if without, he has his election to accept or reject it.

The parties have themselves agreed that the invention of 1852 is an improvement upon the patent of 1851. In the grant the patent is described as being " for a coal-burner, so constructed as to produce combustion of the inflammable gases of anthracite coal," and the application as being for an improvement upon the patent. It is true that the application is not referred to by its date, but there can be no doubt as to its identity, because the language adopted to describe the patent is not that of the claim in the patent itself, but of the application of 1852. Besides, the application is said to be then pending, and it is not pretended that Littlefield had any other on file in the Patent Office at that

---

* Gayler v. Wilder, 10 Howard, 477.

date. This relieves us from an examination of the specifica-
tions in the patent and application, for the purpose of ascer-
taining whether in point of fact the one was an improvement
upon the other. Littlefield having agreed that it was, and
having induced Treadwell & Perry to purchase by reason of
this agreement, cannot now deny it.

It is clear, also, that the idea which Littlefield had in
mind, and which he was endeavoring by his devices to make
practically useful, was greater economy in the use of the in-
flammable gases of coal to produce combustion. It is not
important in this suit that the patent, which had then been
obtained, was not in fact suited for that purpose. It is suf-
ficient that it was intended to be so. The subsequent de-
vices, better adapted to the end to be ·accomplished, may
therefore properly be regarded as improvements upon the
original invention. They produce a stove doing the same
thing which the first was intended to do, but doing it better.
This is the proper office of an improvement.

The assignment in this case, by its express terms, covers
all improvements in the original patent or the invention de-
scribed in the application of 1852. It carried with it the
legal title to the existing patent. If one had been issued
upon the application, that, too, would have inured to the
benefit of the assignee, because in that case it would have
been the assignment of a perfected invention. Without
considering whether the invention upon which the patent
of 1854 issued was not, in fact, the same to all intents and
purposes as that of 1852, it is sufficient for the purposes of
this case that it was an improvement upon it, or perhaps
more properly, that invention perfected. An assignment of
an imperfect invention, with all improvements upon it that
the inventor may make, is equivalent in equity to an assign-
ment of the perfected results. The assignment in this case
being such a one, the assignees became in equity the owners
of the patent granted upon the perfected invention; that
is to say, of the patent of 1854. Littlefield took the legal
title in trust for them, and should convey. Courts of equity
in proper cases consider that as done which should be. If

there exists an obligation to convey at once, such courts will oftentimes proceed as if it had actually been made.

There is here no attempt to obtain the specific performance of a contract, but to restrain this patentee from infringing upon rights which, in a court of equity, he is deemed to have assigned. In other words, this complainant is in equity an assignee, and entitled to protection as such. If the assignment in precisely its present form had been executed after the last reissue was granted, we think it would hardly be claimed that the legal title to all the present outstanding patents did not pass with it. What such an assignment could do in respect to legal titles this has done in respect to such as are equitable. The contest is now between an assignor in equity and his assignee. A court of equity will in such a case give the same effect to an equitable title that it would to one that was legal.

It is next contended that the assignment in this case was forfeited before the commencement of this action, because of the failure of Treadwell & Perry to perform its conditions. There is no proof that the royalty on the stoves made and sold before the action was commenced was sufficient to discharge that part of the debt due from Littlefield to Treadwell & Perry, which was first to be paid out of it before anything was payable to him, and there could be no forfeiture for a neglect to make and sell, until after reasonable notice of the default. No such notice is proven or even claimed.

It is next insisted that if the plaintiff claims the benefit of the last reissues, he puts it out of his power to have damages for infringements previous to their date. The original bill in this cause was filed August 27th, 1862. Everything since that time has been done *pendente lite*. The first reissue was granted November 19th, 1861, and the first patent for an improvement on the patent of 1854 was issued on the 27th June previous. All in the way of reissues or improvements except these has been done pending the suit. The litigation gathers to its harvest the fruits of the labors of Littlefield and his associates during its pendency. His infringement

and that of his codefendant Jagger, claiming under him, commenced in 1862, only a short time before the action was commenced. The question presented by this objection is, therefore, comparatively unimportant; but if it were not, the result would be the same. For as Littlefield held his patents all the time in trust for these assignees to the extent of the territory they owned, he must account to them for the profits he has made by the unlawful use of the trust property.

We are, therefore, clearly of the opinion that the complainant is in equity the assignee of Littlefield, and that he is entitled to recover of the defendants the profits they have made out of these infringements upon his rights. So far there is no error in the court below.

We now come to the decree itself. The plaintiff is entitled, as has been seen, to recover of the defendants the profits they have made from the use of the several inventions within the assigned territory; but the decree directed an account of " all the profits, gains, and advantages which the said defendants, or either of them, have received, or which have arisen or accrued to them, or either of them, from the manufacture, use, or sale of stoves within the States of New York and Connecticut, embracing the improvements described in and covered by the said letters-patent, and the reissues thereof, or any of them." An account stated upon these principles has been approved by the court in the decree appealed from.

The decree is, as we think, too broad. After the interlocutory decree below settling the principle of the accounting, the case of *Mowry* v. *Whitney** was decided in this court. It was there held that the question to be determined in such a case as this was, " what advantage did the defendant derive from using the complainant's invention over what he had in using other processes then open to the public, and adequate to enable him to obtain an equally beneficial re-

---

* 14 Wallace, 620.

sult? The fruits of that advantage are his profits." For such profits he is compelled to account as damages.

Here the order is to account for all profits received from the manufacture, &c., of stoves, embracing the improvements covered by any of the patents. This would cover all the profits made upon a stove having in it any one of the improvements patented. The true inquiry is as to the profits which the defendants have realized as the consequence of the improper use of these improvements. Such profits belong to the plaintiff, and should be accounted for to him. The account of the master may not charge the defendants with more than the complainant is entitled to recover. The conduct of the defendants in withholding statements which it would seem they ought to be able to make, and their evident unwillingness to account, would induce us to sustain the report had the order of reference been less broad. As it is, we think the decree, so far as it settles the principles of the accounting for profits, must be reversed, and that the inquiry before the master must be confined to an account of the profits received by the defendants as the direct result of the use within the assigned territory of the several inventions involved in the case.

This reverses the decree.

Many exceptions were taken to the master's report. Some were as to the matters of form, and others were directed to the principles of the accounting as settled by the decree. It is unnecessary to consider these further. Another account may dispose of them all.

The Circuit Court, however, in rendering its final decree, added interest to the amount found by the master to be due upon the account for profits. In *Mowry* v. *Whitney* it was held that interest is not allowable in such cases, except under peculiar circumstances. The testimony thus far presented in this case does not, in our opinion, justify such an allowance. It will be for the court to determine, upon the coming in of the new report, accompanied by other evidence, whether the conduct of the defendants has been such as to subject

them to liability in this particular. Profits actually realized are usually, in a case like this, the measure of unliquidated damages. Circumstances may, however, arise which would justify the addition of interest in order to give complete indemnity for losses sustained by wilful infringements.

DECREE REVERSED to the extent hereinbefore indicated, and the cause REMANDED, with instructions to take a new account of profits and proceed

IN ACCORDANCE WITH THIS OPINION.