## PIKE v. UNITED STATES.
### Civ. 2941.

United States District Court
D. Connecticut.
Aug. 15, 1951.

Walter W. Walsh, John J. Sullivan, New Haven, Conn., Kenneth Ray, New York City, for plaintiff.

Adrian W. Maher, U. S. Atty., New Haven, Conn., Edward J. Lonergan, Asst. U. S. Atty., Hartford, Conn., Fred Rita, Department of Justice, Washington, D. C., for defendant.

HINCKS, Chief Judge.

At the close of the trial herein, I requested the plaintiff to submit proposed findings and conclusions. This was done and the parties have addressed briefs to the findings and conclusions thus proposed. In its brief, the defendant has not questioned the proposed findings and my study of the record satisfies me that the findings

as proposed are indeed required by the proofs. I therefore adopt them and enter them over my signature and this opinion will use the same abbreviated designations to identify the corporations with which the plaintiff dealt.

The defendant questions (1) whether on the facts the court should conclude that the agreements of the plaintiff with Cleveland or with Westvaco constitute sales or merely license agreements and (2), if sales, whether the subject-matter thereof constituted "capital assets" within the meaning of Sec. 117 of the Internal Revenue Code, 26 U.S.C.A. § 117.

■ The plaintiff's agreement with Cleveland of August 25, 1941, although it took the form of an amendment of the pre-existing license agreement between these parties, by its terms contained contingencies whereby the original license was to be converted into the sale. These contingencies came to pass and under the terms of the agreement title to the plaintiff's invention passed to Cleveland. Plainly this was a sale. The defendant asserts that thereby "the taxpayer gave up no more than he had by the original license." But that is not so. By the later agreement the plaintiff transferred title to his claimed invention which by the earlier agreement had carefully been reserved.

■ The Westvaco agreement of September 14, 1944 provided expressly: "This agreement shall be construed as a license of the aforesaid patents and not an assignment thereof from Pike to Westvaco." The defendant leans heavily on this language. But as to this, it is the operating intent of the parties that must control. The agreement shows that intent to be that Westvaco for the life of the patents should not only have the exclusive right to practice the processes and to license others but, very significantly, the right to enforce the patents against infringers *in its own name*, retaining as its own any recoveries so obtained. Thus the operative intent was plainly to pass all the rights the plaintiff had. A transaction having such an intended effect was an assignment of the proprietary interest and hence in legal effect a sale. Ridsdale Ellis on Patent Assignments and Licenses (2d Ed.) Secs. 57 and 63; Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 342 L.Ed. 923; Kimble Glass Co. v. Commissioner, 9 T.C. 183. See also Weiss v. Stern, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, and Allen v. Werner, 5 Cir., 190 F.2d 840.

■ The defendant also, for its position that the questioned transactions were licenses rather than sales, rests upon the fact that the agreements were terminable at the vendees' option on notice. But these and similar provisions in the agreement were conditions subsequent. Such provisions, providing for reassignment upon the falling in of the specified events, do not obliterate the assignments already accomplished. There is abundant authority for the proposition that a condition subsequent does not transform a transaction which would otherwise be a sale into a license. Commissioner v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339; Edward C. Myers, 6 T.C. 258; Kimble Glass Co., v. Com'r, supra. See also Green v. Le Clair, 7 Cir., 24 F.2d 74; and Littlefield v. Perry, 21 Wall. 205, 88 U.S. 205, 22 L.Ed. 577.

In short, conclusions 3 and 4, that the questioned transactions were sales, were plainly required.

Perhaps the principal emphasis in the defendant's brief is put upon the contention that in the setting of this case the plaintiff's inventions and patents, even if dealt with by assignment and sale, did not constitute capital assets within the meaning of Section 117(a) (1) of the Internal Revenue Code.

The applicable statute read as follows: "The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is

subject to the allowance for depreciation provided in section 23(*l*) * * *." For present purposes, the critical question is whether the assets in question fall within the stated exception of "property held by the taxpayer primarily for sale to customers in the ordinary course of his * * * business".

■ In the light of all the evidence, I think this question should be answered in the negative, favorably to the plaintiff. That the plaintiff's occupation was that of consulting engineer is not disputed: he has had a distinguished career in that profession. In advising clients, he occasionally found solutions for their technical problems by way of inventions, some of which he patented, assigning the patents to the clients as an incident of his professional service. There was no evidence that he was retained professionally to make and assign inventions. The patents assigned to Westvaco were typical of this practice. These covered and included inventions which he had made in the course of a professional retainer and assigned to the client without reserving royalty rights. When the client had no further use for the same, under the terms of the original assignment they reverted to him and were held by him for almost fourteen years without any effort on his part to sell the same until the sale to Westvaco under the circumstances set forth in Par. 19 of the Findings. And the invention assigned to Cleveland had evolved not in the ordinary course of plaintiff's business but during a period of incapacity from all business apparently as a mental diversion. Other than these two sales, there is no evidence of sales or assignments of patents and inventions, or of effort to accomplish sales.

Granted that a consulting engineer is not necessarily precluded from having a business in making and marketing inventions, the evidence here demonstrates that this plaintiff had not made a business of such activity. The two sales here involved were not made in the ordinary course of a business in selling patents, but rather as an incident to his professional activity. And if, as I conclude, the plaintiff had no business of selling inventions and patents the inference necessarily follows that the subject-matter of these two sales had not been held primarily for sale to customers in the ordinary course of his business. And the inference is supported by the plaintiff's testimony, which I accept as wholly credible, that the property was held for use in his professional activities. As plaintiff's brief indicates, there is a wealth of authority which supports my conclusion. I am content to cite the following cases. Samuel Diescher, 36 B.T.A. 732; Carl G. Dreymann, 11 T.C. 153; Edward C. Myers, 6 T.C. 258; Briggs v. Hofferbert, D.C., 85 F.Supp. 941, affirmed 4 Cir., 178 F.2d 743; Evans v. Kavanagh, D.C., 86 F.Supp. 535, affirmed 6 Cir., 188 F. 2d 234.

For its opposition to my conclusion, the defendant relies on Fields v. Commissioner, 2 Cir., 189 F.2d 950, June 1, 1951, where it was held that the sales there involved were of property held for sale in the ordinary course of the taxpayer's business. There the taxpayer was a *professional* playwright, a fact which imported that he was in the business of writing plays for profit. And the sale or licensing of his copyrighted works was the only way by which he could realize pecuniary return from his plays. This required the inference that his plays were written for sale in his business. The opinion cited the concurring opinion of Judge L. Hand in Goldsmith v. Commissioner, 2 Cir., 143 F.2d 466. In that case the taxpayer conceded that he was in the business of writing plays and the opinion rested on that fact. But here the taxpayer was not a professional inventor whose business it was primarily to sell his inventions and patents: he strenuously denies engagement in any such *business* and the evidence supports his denial. His inventions and patents were helpful to him in his activity as a consulting engineer and he held them for use in connection with that profession. He no more held them for sale than a home-owner holds his house for sale because he knows (if he thinks about it) that he may sell his home if the size of family or his residential requirements shall some

day suggest such a course. And he was no more in the patent-selling business than a home-owner is in the real estate business.

Since the defendant has not questioned that the property here involved satisfies the other requirements of "capital assets" as defined in Sec. 117, there is no need to demonstrate their presence. Suffice it to say that I find the property in all respects to satisfy the definition. And since I find all the proposed conclusions required by the facts, I enter them herewith as the conclusions of the court, together with the findings.

Plaintiff may submit for entry a form of judgment to be settled in chambers on notice unless notice be waived.

The above-entitled cause came on regularly for trial on June 11, 1951 before the above entitled court sitting without a jury, and evidence both oral and documentary having been introduced, and the parties having stipulated to certain matters, and the cause having been submitted for decision, the court, having given consideration to the testimony of the witness, the stipulated facts, the documentary evidence and the briefs of counsel, finds the facts and states the conclusions of law, as follows:

## Findings of Fact

1. Plaintiff is now and has been since 1916 a consulting chemical engineer of distinction. During his professional career he has written and published over 20 articles on varied scientific and engineering subjects. The plaintiff has appeared, as a Consulting Chemical Engineer, before Committees of Congress on the development of the mineral resources of the West. Plaintiff's eminence in the scientific and engineering world is recognized in various publications, such as "Who's Who in Engineering".

2. After four years of study, plaintiff was graduated in 1907 from the University of California with a degree in Mechanical Engineering, and thereafter took one year of college work in chemistry to qualify himself as a chemical engineer, as well as a mechanical engineer.

3. While at said college plaintiff was elected to the Honorary Scientific Societies Sigma XI and Tau Beta Pi. Plaintiff is now and has been a member of many professional, chemical and engineering societies.

4. Since May 1947 plaintiff has resided at Brook Lane, Greenwich, Connecticut. Prior thereto plaintiff resided in Pittsburgh, Pennsylvania, including residence there during the entire years of 1943 and 1944.

5. Plaintiff does not maintain any laboratory or workshop for research or experimenting, but maintains an office in the Gurley Building, Stamford, Connecticut, where he practices his profession as a consulting chemical engineer.

6. Since 1917 plaintiff has been retained by numerous clients as a professional consulting chemical engineer in various chemical fields, including magnesia, magnesite, cement, phosphorous, potash, alkali and electrolytic iron.

7. In the year 1938 plaintiff, while ill and not retained by any client, conceived the idea of manufacturing a heavy duty bearing with three layers of metal, called a tri-metal bearing and filed on March 18, 1938 a patent application on this discovery in the U.S. Patent Office, Serial No. 208607.

8. In March of 1939 the Cleveland Graphite Bronze Company of Cleveland, Ohio (herein referred to as "Cleveland"), unsolicited by plaintiff, telephoned plaintiff and inquired about said tri-metal bearing and requested that plaintiff come to its office in Cleveland for a conference respecting his said patent application. Plaintiff did go to the office of Cleveland, pursuant to said telephone request, and later entered into a written agreement with Cleveland on March 21, 1939 licensing Cleveland under said patent application Serial No. 208607 for the entire life of any patent that might issue thereon, less one day.

9. Plaintiff prior to March 21, 1939 had never sold nor solicited the sale of any of his discoveries, inventions, patents or patent applications, nor had he received any

104

royalties or payments with respect to any invention, discovery, patent or patent application. At no time has plaintiff ever taken depreciation on any patent or patent application.

10. On July 29, 1940 plaintiff's said patent application became involved in the U. S. Patent Office in an interference with patent application Serial No. 290007 filed on August 14, 1939 by one W. H. Bagley, Jr., designated in said office as Interference No. 78498.

11. As a result of said interference proceeding, Cleveland requested plaintiff to concede priority of invention to Bagley thereby permitting a patent to issue on the Bagley application and resulting in the abandonment of plaintiff's patent application. In return for such concession of priority Cleveland agreed to pay plaintiff amounts designated as "royalties" for the life of the patent to issue to Bagley as a result of the concession of priority. At such time plaintiff understood that Cleveland had an interest in the Bagley patent application which made it unimportant to Cleveland which party prevailed in the interference.

12. Plaintiff accepted this proposal of Cleveland and an agreement was entered into between plaintiff and Cleveland on August 25, 1941, which altered and changed the contractual relationship between the parties established by the previous agreement of March 1, 1939. The said agreement required Cleveland to make payments to plaintiff for the entire life of the Bagley patent. The agreement of August 25, 1941 was entered into by plaintiff to avoid the cost and uncertainty of litigating the interference proceeding.

13. As a result of the agreement of August 25, 1941 plaintiff abandoned his said patent application and Patent 2,316,119 duly issued on April 6, 1943 to Bagley. The amounts paid to plaintiff by Cleveland after the agreement of August 25, 1941 were paid pursuant to such later agreement in consideration of the concession of priority and the abandonment of plaintiff's said patent application.

14. By said agreement of August 25, 1941 plaintiff sold, assigned and transferred to Cleveland his entire right, title, and interest in and to his invention, and discovery of the tri-metal bearing and the patent application, with respect thereto.

15. The concession of priority to Bagley by plaintiff in Interference No. 78498 divested plaintiff of his entire right, title and interest in and to his invention and discovery of the tri-metal bearing and his patent application with respect thereto.

16. In 1941 plaintiff was retained as a consulting chemical engineer by the Union Pacific Railroad Company to develop the mineral resources of the mountain states traversed by said railroad.

17. In 1941 plaintiff appeared before a sub-committee of the U. S. Senate Committee on Public lands and described to the Committee his proposals for developing a chemical industry in the Inter-Mountain States, and he submitted a detailed report to the Committee, outlining certain proposals. The Congress thereafter appropriated funds for experimental work to test certain of the processes, which work was conducted in 1942 and 1943 by the U. S. Bureau of Mines.

18. In 1944, pursuant to his duties as consulting chemical engineer for the Union Pacific Railroad Company, plaintiff approached Westvaco Chlorine Products Corporation (hereinafter referred to as "Westvaco") to interest that Corporation in starting a chemical manufacturing business in Wyoming and Idaho, primarily to utilize the mineral deposits in those states.

19. Between 1941 and August of 1944 plaintiff had published in scientific articles detailed descriptions of the mineral deposits in the Inter-Mountain States and had proposed processes for their utilization. In 1944 one, M. Y. Seaton, who was an officer of Westvaco, discussed with plaintiff the mineral deposits in the Inter-Mountain States and the processes proposed by plaintiff for their utilization, and told plaintiff that Westvaco would invest money in such projects only on condition that plaintiff would sell, assign and transfer to Westvaco plaintiff's entire right, title and interest in and to certain inventions, discoveries, patents and patent applications

then owned by plaintiff, which would be useful in the contemplated project.

20. Plaintiff, with the consent of Union Pacific Railroad Company, entered into an agreement with Westvaco on September 14, 1944, transferring and assigning to Westvaco plaintiff's entire right, title and interest in and to said discoveries, inventions, patents and patent applications. These inventions, discoveries, patents and patent applications sold to Westvaco all related to processes for manufacture of chemical products.

21. Pursuant to said Agreement, plaintiff received payments from Westvaco in consideration of said sale, commencing in 1944, and is to continue to receive such payments from Westvaco during the life of said Agreement.

22. During the period from 1926 through 1928 plaintiff had been retained as a consulting chemical engineer to Stockholders Syndicate for the development of processes to utilize the phosphate rock in Idaho, where said Stockholders Syndicate owned a large deposit of such mineral. Plaintiff received fees for his professional services as a consulting chemical engineer for said Stockholders Syndicate. In the course of his work as said consulting chemical engineer for said Stockholders Syndicate, plaintiff, without obligation, voluntarily and incidentally and without additional payment of any nature or description, transferred his discoveries, inventions, patents, and patent applications, developed in the course of his work for Stockholders Syndicate to said Stockholders Syndicate, upon condition that in the event Stockholders Syndicate abandoned the project, Stockholders Syndicate would return to plaintiff said discoveries, inventions, patents and patent applications so transferred. Thereafter Stockholders Syndicate withdrew from the project, cancelled its agreement with plaintiff, whereupon said discoveries, inventions, patents and patent applications reverted to plaintiff.

23. Plaintiff continued the prosecution in the U. S. Patent Office of certain of the patent applications which reverted to him from Stockholders Syndicate at his own cost and expense but did nothing further

with said inventions, discoveries, patents and patent applications until the sale thereof to Westvaco in 1944, and during said period plaintiff made no attempt to sell, transfer, license or assign, or in any way deal in said inventions, discoveries, patents and patent applications, until he sold the same to Westvaco.

24. Plaintiff's motive in holding inventions, discoveries, patents and patent applications, was to improve his professional status as a consulting chemical engineer.

25. Said inventions, discoveries, patents and patent applications so reverting back to plaintiff from said Stockholders Syndicate were the same inventions, discoveries, patents and patent applications that were sold, assigned and transferred by plaintiff to Westvaco by his agreement with Westvaco of September 14, 1944.

26. Said agreement of August 25, 1941 with Cleveland was not cancellable by plaintiff and was cancellable by Cleveland only upon the happening of certain events which have not, in fact, occurred.

27. The agreement of September 1944 with Westvaco provided by its terms that said agreement was cancellable only at the option of Westvaco.

28. The agreements entered into between plaintiff and Cleveland and Westvaco contained certain conditions subsequent whereby in the event of default by said Companies in performance of their obligations, plaintiff would have the right of cancellation of the respective agreements.

29. Plaintiff owned and held his trimetal bearing invention, discovery and the patent application with respect thereto more than eighteen months prior to the sale thereof in 1941.

30. Plaintiff owned and held the inventions, discoveries, patents and patent applications with respect thereto sold to Westvaco more than six months prior to the sale thereof in 1944.

31. Plaintiff perfected and held his patents, patent applications, inventions and discoveries incidental to his occupation as a consulting chemical engineer and for the sole purpose of enhancing his professional

standing and reputation as a consulting chemical engineer. Plaintiff never intended to, nor did he abandon, his occupation as a consulting chemical engineer, nor did he intend to, nor did he, enter into the chemical or bearing business or use or manufacture under his said patents, patent applications, inventions or discoveries.

32. Plaintiff is a taxpayer on a calendar year basis.

33. In the Calendar Year 1943 plaintiff received $15,710.80 from Cleveland under the said Agreement of Sale of 1941 which sum was reported by him as ordinary income in his Federal income tax return for 1943.

34. In the Calendar Year 1944 plaintiff received the sum of $24,273.06 from Cleveland and the sum of $2,500 from Westvaco under his said Agreements of Sale with said Companies which sums he reported as ordinary income in his 1944 Federal income tax return.

35. Plaintiff duly filed his Federal income tax return for the calendar year 1943 with the Collector of Internal Revenue for the 23rd District of Pennsylvania and paid the said Collector the taxes shown due on said return in the total sum of $8,265.74. In addition the sum of $2,544.93, representing a deficiency for the year 1943, resulting from adjustments not in issue in this action, was paid with interest on August 23, 1945.

36. Plaintiff duly filed his Federal income tax return for the calendar year 1944 with the Collector of Internal Revenue for the 23rd District of Pennsylvania and paid the said Collector the income taxes shown due on said return in the total amount of $14,903.98. The sum of $436.42 representing a deficiency for the year 1944 resulting from adjustments not in issue in this action, was paid with interest on February 18, 1947 and on March 15, 1947.

37. Plaintiff duly filed claims for refund within the statutory period with the Collector of Internal Revenue for the 23rd District of Pennsylvania for said calendar years 1943 and 1944, requesting refunds of said taxes so paid with interest, upon the ground that said amounts of $15,710.80 and $26,773.06 received by him in the years 1943 and 1944 from Cleveland and Westvaco respectively were received by plaintiff from the sale of his said inventions, discoveries, patents and patent applications and were therefore taxable under the long term capital gain rates provided in Section 117 of the Internal Revenue Code, 26 U.S.C.A. § 117, and not as ordinary income as reported by plaintiff in his tax returns for such years.

38. Plaintiff's said claims for refunds were rejected by the Commissioner of Internal Revenue on January 5, 1949 and this action was duly commenced on April 14, 1950, within the statutory period for filing claims for refunds of over-payments of taxes, for tax refunds in the amounts of $2,279.06 for the calendar year 1943 and $8,323.17 for the year 1944 with interest from the date of payment (except that with respect to the year 1944 plaintiff waived interest in excess of $1,600) together with costs in this action, on the ground that said amounts represented over-payments of Federal Income Taxes for said years by reason of treatment in said tax returns of said amounts as ordinary income, rather than as long term capital gains from the sale of capital assets.

### Conclusions of Law

1. This court has jurisdiction of this cause of action and of the parties hereto.

2. The agreement between plaintiff and Cleveland of March 21, 1939 effected only a license to Cleveland of plaintiff's invention and discovery of the tri-metal bearing and the patent application with respect thereto. Plaintiff reserved the legal right to his said invention, discovery and patent application.

3. The agreement between plaintiff and Cleveland of August 25, 1941 effected a sale in such year by plaintiff of his entire right, title and interest in and to his invention and discovery of the tri-metal bearing and the patent application with respect thereto.

4. The agreement between plaintiff and Westvaco of September 14, 1944 effected a sale in such year by plaintiff of his en-

tire right, title and interest in and to the inventions, discoveries, patents and patent applications specified in said Agreement.

5. The inventions, discoveries, patents and patent applications involved in this suit were not stock in trade nor property of a kind properly includible in the inventory of plaintiff, nor property held by plaintiff for sale to customers in the ordinary course of his trade or business, nor were said inventions, discoveries, patents or patent applications property used by plaintiff in his trade or business.

6. All the inventions, discoveries, patents and patent applications involved in this suit at the time of the sale thereof, constituted "capital assets" within the meaning of Section 117(a) of the Internal Revenue Code, 26 U.S.C.A. § 117(a).

7. All the inventions, discoveries, patents and patent applications involved in this suit were held by plaintiff for more than the period of time required by Section 117(a)(4) of the Internal Revenue Code to qualify them as long-term capital assets.

8. The income received by plaintiff from Cleveland in 1943 and 1944 constituted long term capital gain under the provisions of Section 117 of the Internal Revenue Code.

9. The income received by plaintiff from Westvaco in 1944 constituted long term capital gain under the provisions of Section 117 of the Internal Revenue Code.

10. Plaintiff is entitled to treat monies received by him from Cleveland and from Westvaco pursuant to the Agreements herein referred to as long term capital gains under the provisions of Section 117 of the Internal Revenue Code.

11. Plaintiff has overpaid his Federal income taxes for 1943 in the amount of $2,279.06 and has overpaid his Federal income taxes for 1944 in the amount of $8,323.17 and plaintiff is entitled to recover said sums from the defendant plus interest thereon at the rate provided by law from the date of payment thereof, provided, however, that with respect to the year 1944 plaintiff is not entitled to recover interest in excess of $1,600. Plaintiff is further entitled to recover such costs as are properly allowable in this action.

12. Counsel for the parties have stipulated that they will agree as to the time of payment of the above amounts for the purpose of computing the amount of interest due plaintiff by defendant.

13. Judgment will be entered for plaintiff in the sum of $10,602.23 plus interest on the respective principal sums from the respective dates of payment as set out in conclusions 10 and 11 above (except that with respect to the year 1944 plaintiff is not entitled to recover interest in excess of $1,600), together with such costs as may be properly allowable.

It is so ordered and judgment shall be entered accordingly.