## DE STUBNER v. UNITED CARBON CO. et al.

### Civil Action No. 481.

District Court, S. D. West Virginia.
Sept. 9, 1946.

Ben O. Shepherd, of Detroit, Mich., and Charles M. Love, Jr., of Charleston, W. Va., for plaintiff.

Rummel, Blagg & Stone, of Charleston, W. Va., for defendants.

MOORE, District Judge.

In a former opinion filed in this case on July 13, 1945, on a motion of defendants for a more definite statement and bill of particulars, the allegations of plaintiff's complaint were briefly summarized. D.C., 4 F.R.D. 483. Therefore, only such of the allegations and defenses will be referred to herein as are necessary to form the basis of the conclusions announced.

Briefly, plaintiff claims that defendants are accountable to him (1) for royalties on manufactured dustless carbon black, the processes for which it is alleged are covered by a series of license agreements with plaintiff as inventor; (2) for use of his ideas and discoveries in the manufacture of dustless carbon black, irrespective of whether the license agreements relate to that field; and (3) for minimum royalties under the license agreements, if it should be determined that no actual royalties are due in excess of the claimed minimum.

On July 31, 1936, pursuant to successive options granted from time to time by plaintiff to defendant United Carbon Company, three separate agreements were signed, a brief description of which and the pertinent parts whereof are as follows:

1. *Agreement between Plaintiff and Defendant United Carbon Company, Inc.* (which succeeded to the rights of defendant United Carbon Company under the options). This agreement recites that a corporation known as Microid Process, Inc., had been organized for the purpose of exploiting plaintiff's inventions; that the capital stock of Microid, exclusive licensee of de Stubner with the right to sub-license, was to be divided so that de Stubner would own one-third and United two-thirds of the stock, with preferential dividend rights to de Stubner up to the amount of $12,000 per year, exclusive of the first year, in which the preferential dividend was to be $7,500. This agreement contains the following paragraph:

"6. Should Microid not have funds available for the purpose, United, so long as it retains the right to use a license bearing even date herewith granted by Microid to United, shall advance the funds necessary to pay taxes, including those necessary to maintain the corporate existence of the corporation, and such expenses as Microid shall have incurred by order of its board of directors."

The contract also provides in Paragraph 7 for advances or loans to be made from United to Microid. The paragraph concludes:

"These loans shall include such sums as United may advance to make up any deficiency in the dividends paid in priority on the "A" Stock, as well as any sums advanced for research, patent applications and legal expenses connected therewith, and expenses of patent litigation. United,

at its option, may elect to treat such advances including interest, or any part thereof, as pre-paid royalties or license fees."

2. *Agreement between Plaintiff and Microid Process, Inc.* This is an exclusive license agreement from plaintiff to Microid to use and sub-license the use of:

"(a) The inventions, improvements or discoveries disclosed in the patents or applications therefor, more fully set forth in a schedule of such patents and applications attached hereto as Exhibit "A"; * * * (c) All inventions, discoveries or improvements relating to any idea, machine, apparatus, formula, fact or process' pertinent or valuable to the science and art of pigment dispersions of whatever kind and nature heretofore or hereafter made, discovered, compiled or developed by de Stubner or with respect to which he has a right to grant a license."

The contract further provides for the issuance of the priority stock mentioned in agreement number 1, and continues as follows in Paragraph (3):

"(a) Microid hereby employs, and de Stubner hereby agrees to serve, as director of technical research of Microid for the period of five (5) years from the date hereof.

"(b) de Stubner shall receive no salary for his services as such director of technical research, but when and if the dividends paid on the "A" stock of Microid shall not amount to Twelve Thousand Dollars ($12,000) per year, de Stubner shall be at liberty to terminate said employment unless some one on behalf of Microid shall pay to the holders of "A" stock the difference between the dividends actually declared and paid in such year on said "A" stock and said sum of Twelve Thousand Dollars ($12,000), provided that during the period of one (1) year following the date hereof the amount of dividends, to be so paid, shall be Seven Thousand Five Hundred Dollars ($7,500) instead of Twelve Thousand Dollars ($12,000).

"(c) All patents, patent applications, inventions, discoveries or improvements thereof, including all foreign rights, and any idea, machine, apparatus, formula, fact or process pertinent and valuable to the science and art of pigment dispersions of whatever kind and nature made, discovered, compiled or developed by de Stubner during his service as director of technical research for Microid shall be subject to the terms and conditions of the exclusive license herein granted to Microid,
* * *

"(5) The license hereby granted may be terminated (a) by an adjudication of bankruptcy or insolvency of the licensee; or (b) if during the period of any year beginning on the 1st day of August the dividends paid on the "A" stock of Microid, plus such funds as may be paid to the holder of such stock, or ratably to all holders if there be more than one, shall not equal the sum of Twelve Thousand Dollars ($12,000), provided that during the year beginning August 1, 1936, such termination shall not become effective if the dividends so paid on the "A" stock, plus such additional funds as may be paid pursuant to this agreement, shall equal the sum of Seven Thousand Five Hundred Dollars ($7,500)."

It is also provided that on termination of the license any sub-licenses should remain in effect, except that plaintiff would be deemed the licensor and the owner of all Microid's former rights therein. Attached to this agreement as Exhibit "A" were three schedules, the first containing issued patents, the second, pending patent applications, and the third, a list headed "Docketed but not Filed."

3. *Agreement between Microid Process, Inc., and Defendant United Carbon Company, Inc.* By this agreement Microid grants to United an exclusive license "within its stated fields" "to use and to sub-license others to use, any and all patents and inventions owned by Microid or under which Microid has a right to grant such license, for the treatment of carbon black or other pigments produced by the combustion or decomposition of hydrocarbon gases, petroleum or petroleum products and lamp black, throughout the world, under all the inventions and discoveries, whether patented or unpatented, relating to such use, and including the patents and inventions more particularly set forth in

the said schedule of patents, applications and inventions attached hereto."

In the preamble to this agreement it is stated that "Microid is the owner of or has the right to grant licenses under certain inventions and discoveries relating to dispersions of finely divided solids, * * *." No rate of royalty is fixed by this agreement, but this was left to be determined later under certain principles set out in the agreement. No minimum royalty is mentioned. The license is made cancellable by the licensee as of the first day of August following receipt by the licensor of notice of cancellation, provided said notice should not be effective until ten days after receipt. A further provision of the license is that in event of its reverting to plaintiff as licensor under the terms of agreement number 2, plaintiff would receive only one-third of the amount of royalties which would otherwise be payable. Attached to this agreement is the same schedule of patents, pending patent applications, and the list headed "Docketed but not Filed," as those attached to agreement number 2.

On August 18, 1936, the directors of Microid passed the following resolution:

"Resolved, that the officers of the Company be, and they are hereby, authorized and directed to pay to Mr. de Stubner the sum of Six Hundred and Twenty-five Dollars ($625) per month, as per contract, such payments to begin with the month of August, 1936, and to be made on or about the last day of each month."

The foregoing agreements contain voluminous other provisions, but for the sake of brevity they are omitted here, since I believe those mentioned contain all that are essential to a decision of this case.

An action instituted by de Stubner culminated in a decision by the West Virginia Supreme Court of Appeals cancelling the de Stubner-Microid license, effective August 1, 1942. De Stubner v. Microid Process, 124 W.Va. 591, 21 S.E.2d 154.

Motion was made for a judgment on the pleadings in the sum of $24,805.34, alleged to be the amount due the plaintiff under the various agreements, and the resolution of Microid's directors. This motion was denied and the court heard testimony without a jury on all phases of the case. The reporter's transcript of the testimony covers nearly 2,000 pages. 136 exhibits were filed by the plaintiff, and 249 by the defendant. The hearing consumed approximately three weeks. Plaintiff produced no witness other than himself, except as to one minor detail. Defendants produced numerous witnesses.

In substance plaintiff's testimony was that prior to the year 1934 he had discovered a method of mixing carbon black and water in equal proportions so as to form a pasty mass; that this proportion of the two substances is necessary in order successfully to manufacture dustless carbon black; that late in the year 1933 he was approached by one Grote, an employee of United Carbon Company, who discussed with him his (plaintiff's) inventions and discoveries in the art of pigment dispersions; that he not only explained to Grote his inventions and discoveries in that field, but also communicated to him his alleged discovery of the method of mixing carbon black and water to produce dustless carbon black; that thereafter he was summoned to Charleston, West Virginia, by Oscar Nelson, head of United Carbon Company (and later, when it was incorporated in March, 1935, of United Carbon Company, Inc.), and was told by Nelson that he (Nelson) was not interested in the subject of pigment dispersions but that his sole interest was in the production of "aggregates" (this being a term which plaintiff later explained related to dustless carbon black); that Nelson's reason for his interest in "aggregates" was that he had no process of his own for making dustless carbon black, but was forced to operate in that field under licenses from other manufacturers; that plaintiff assured Nelson he could provide him with a "non-infringing" method of making dustless carbon black; that Nelson at that time insisted that plaintiff should breathe no word, either to any outsider or even to members of Nelson's own organization, of the true nature of their negotiations, but as to all persons other than themselves it must be made to appear that their dealings

related solely to pigment dispersions; and that thus Nelson created what plaintiff calls "a veil of secrecy," which was not to be lifted until Nelson gave the word; that as a result of this conference the first of the series of options which later culminated in the three agreements of July 31, 1936, was entered into; that plaintiff was thereupon established in a laboratory provided by Nelson on Bullitt Street in Charleston, West Virginia, was given a monthly salary, and was instructed to conduct such operations as would permit a demonstration as soon as possible of his process for making dustless carbon black; that in the early part of 1934 he established himself in this laboratory, and about the middle of July of that year was ready to make such demonstration; that for this purpose he procured a meat grinder or sausage machine, and that at some time between July 16 and August 7, 1934, Nelson visited the laboratory and there plaintiff showed him how carbon black and water could be mixed in equal proportions, extruded through the apertures in the plate of the meat grinder in the form of spaghetti-like cylinders, dried in a drier prepared for that purpose, and then broken into short lengths to form dustless carbon black.

Plaintiff undertook to show further by his testimony that certain of his patents, applications and discoveries listed as exhibits with two of the aforesaid agreements of July 31, 1936, contained disclosures and claims which related to the process of making dustless carbon black. An analysis of his exhaustive testimony on this phase of his claim reveals that his principal contentions are (1) that by reference in the disclosures in certain of his patents relating to pigment dispersions to the process of mixing carbon black and water in equal proportions, he thereby disclosed the method of making dustless carbon black (although he does not purport to have incorporated such disclosures in any of the claims of his patents), (2) that one of his pending applications, a schedule of which was attached to the agreements, claimed a method of utilizing pressure to deform yielding aggregates, and thus disclosed the underlying principle of an extrusion process for making dustless carbon black, which is the process extensively used by the defendant United Carbon Company, Inc., in the manufacture of its product; (3) that one of the so-called "disclosures" listed under the heading of "Docketed but not Filed" related to the manufacture of carbon black, and another such disclosure related to the manufacture of dustless carbon black; (4) that dustless carbon black is itself a form of dispersion, and (5) that the treatment of carbon black to render it dustless facilitates its use in the rubber tire industry, that its use in that industry consists in grinding and thereby dispersing it in rubber, resulting in a dispersion, and that therefore the manufacture of dustless carbon black in itself relates to the art and science of pigment dispersion.

Defendants' testimony is to the effect that plaintiff never mentioned to Grote any discovery he might have made with reference to mixing carbon black with water; that at the conference with Nelson early in 1934 no mention was made of dustless carbon black, nor was the word "aggregates" ever used; that there was no "veil of secrecy"; that never at that time or any other time did plaintiff discuss with Nelson or any person connected with the defendant companies the subject of dustless carbon black; that the sole purpose and the sole end in view in dealing with the plaintiff was to utilize his knowledge and inventive genius, if such he had, in developing new and improved methods of pigment dispersions; that when plaintiff was installed in the Bullitt Street laboratory he gave his whole efforts, so far as defendants' witnesses were informed, to researches in that field; that no meat grinder or sausage machine was ever placed in the laboratory prior to the latter part of September, 1934, nor was any drier ever used prior to that time; that plaintiff never made any demonstration to Nelson involving the mixing of carbon black with water, or its extrusion through a meat grinder or other device; and that no mention or claim was ever made by plaintiff that he was entitled to any compensation from defendants by reason of their manufacture of dustless carbon black until some time in the year 1942 in the course of a lawsuit,

at which time in a conversation between Osman Swartz, an attorney for defendants, and plaintiff's then attorney, Staige Davis, such a claim was first put forward by Davis on plaintiff's behalf.

Defendants showed by expert testimony that the manufacture of dustless carbon black represents a process diametrically opposite to that of the dispersion of pigments; that the former has for its object the bringing together of fine particles into aggregate masses to form hard pellets, whereas the latter is intended to produce the greatest possible separation of particles into microscopic form so as to bring about a uniform distribution of these particles throughout a dispersion medium, and thus to furnish pigmentation in such products as paint, varnish, lacquer, printing ink, etc. It was shown also that the mixing of carbon black with water to make it dustless is a process that has been known and followed for many years, and which appears in the disclosures of numerous patents antedating those of plaintiff; that defendants had developed such a process before ever coming in contact with plaintiff; that under the process used by defendant United Carbon Company, Inc., the mixture of carbon black with water is not in the constant proportion of equal parts of the two substances, but on the contrary, varies under different conditions and different operators from 35 percent of water to 65 percent; that the extrusion process of making dustless carbon black from a mixture of carbon black and water in these varying proportions was evolved, not from any idea revealed by plaintiff, but from a machine known as the "California Pellet Mill," originally designed for the extrusion of other materials, and afterwards developed by defendants into a machine for extruding small cylinders of dustless carbon black.

In none of the voluminous correspondence between plaintiff and Nelson, the reports made by plaintiff of his progress in research and development, in his later complaints that his inventions and discoveries were not being properly exploited, in testimony given in former litigation arising out of his relationship with defendants, nor in any other document or record exhibited in the case, is there any mention by plaintiff of any claim that the agreements covered, or were intended to cover, dustless carbon black in any of its forms. On the contrary, it is repeatedly shown that plaintiff never conceived any such idea prior to the conversation between Swartz and Davis, in which the claim was first made. In a letter from plaintiff to Nelson dated April 10, 1939, in the midst of complaints that no attention was being given to the exploitation of his patents and processes, plaintiff says:

"In accordance with the option, I gave Microid Process, Inc., an exclusive license to use all of my inventions, processes and patents for pigment dispersions in all colors, dated as of July 31, 1936, for which I was to be compensated solely by the payment of dividends on my stock. * * *

"You have confined all of your efforts to manufacturing and selling black pigmented products in which my inventions and processes have been used. In the nearly three years which have elapsed since you took over this plant you have obtained only one steady customer—you stated in January, 1939, that at best the most that you could see in this business was a gross income of $150,000—and this is all that you have been able to accomplish after spending nearly $300,000 of United Carbon Company money."

These quotations are typical of statements made and reiterated in letters and reports too numerous to mention, all of which are to the same effect, namely, that plaintiff was complaining that his patents, processes, and discoveries were not being properly exploited; yet during all that period United Carbon Company, Inc., was manufacturing and selling large quantities of dustless carbon black manufactured by the processes which plaintiff now says were covered by his inventions and discoveries. It is shown that if dustless carbon black were subject to royalty payments under the sub-license to United Carbon Company, Inc., or otherwise, the resultant profits to plaintiff would have left him no ground or reason for complaint that his inventions were not being utilized.

After carefully considering all the testimony, I find myself unable to give any

credence to that of the plaintiff. Among other instances, I will cite the following to show that, in my opinion, plaintiff testified falsely as to material aspects of his claim. (1) He fixed the time of the alleged demonstration to Nelson as occurring between July 16 and August 7, 1934. It will be remembered that he said that between those dates, by the use of a meat grinder or sausage machine and a drier, he demonstrated to Nelson that carbon black and water could be mixed in equal proportions, extruded in spaghetti-like form, and dried to remove the moisture, and that the product was dustless carbon black. Documentary as well as oral testimony is convincing that no such meat grinder or sausage machine was brought into the laboratory until late in September of that year, and no drier was used before that time. (2) In attempting further to show his right to be regarded as the inventor of the extrusion process by referring to the pending application attached to the agreement of July 31, 1936 (the device for utilizing pressure to deform yielding aggregates), plaintiff devoted a large part of his testimony to explaining that this device had as one of its purposes the extrusion of carbon black mixed with water to form dustless carbon black. Analysis of the claim in the application which was the basis of plaintiff's testimony shows that the device was intended for the contrary purpose of producing dispersions of particles rather than aggregates. In his own handwriting in a note of instructions to his patent attorney it is shown that plaintiff at the time of giving directions for the preparation of the application said:

"The process of my present invention and the mechanical device and apparatus for use therewith bears a superficial resemblance also to known extrusion and molding methods. The resemblance, however, is only superficial and one only needs to compare the resultants to see at a glance the distinctions."

This statement of plaintiff, together with my own analysis of the claim in the patent application, convinces me not only that it had no relation to any extrusion process, but that plaintiff knew it had no such relation, and that his attempt on the witness stand to show otherwise was a deliberate fraud on the court.

Moreover, his entire testimony relative to the so-called "veil of secrecy," and his statements that because of this "veil of secrecy" he continued for a year to give all his efforts to the development of processes for the production of dustless carbon black, while at the same time pretending to all the world except Oscar Nelson that he was engaged only in experiments and research in the field of pigment dispersions, are so fantastic that I can give them no credence whatsoever. He says that the "veil of secrecy" was lifted early in 1935; yet for seven additional years he maintained his silence on the subject of dustless carbon black, and there is not a word in any of the voluminous correspondence which passed between the parties during those seven years to indicate that this subject ever entered his thoughts.

For these reasons I am unable to believe any of plaintiff's testimony as to any of the material phases of his claim.

■ On the other hand, the testimony of defendants' witnesses satisfies me of its truth. I find no substantial contradictions in any of it. It agrees in all material respects with the written evidence which was presented in the form of exhibits, and it conforms to the logic of the situation.

I conclude from the testimony therefore that:

1. The plaintiff had no conversations or conferences with Nelson, or with any other officer of the defendant corporations, with reference to the subject of dustless carbon black.

2. Plaintiff did not conduct any research or experiments in the Bullitt Street laboratory, nor did he make any demonstration to anyone, with relation to any process or method of making dustless carbon black.

3. Plaintiff's claim that defendants owe him royalties on dustless carbon black manufactured by them is an afterthought which did not occur to him prior to the year 1942, and his testimony in this case with reference to his supposed activities in the field of dustless carbon black is merely a series of false statements which he has endeavored to work together into a plau-

sible story in the effort to persuade the Court of the existence of a state of facts which plaintiff knew had no basis in reality.

It remains to be decided, apart from plaintiff's unbelievable testimony, first, whether the sub-license agreement under which United Carbon Company, Inc., manufactured pigment dispersions up to the year 1944, is broad enough to include in its terms processes for the manufacture of dustless carbon black, and secondly, whether the defendants are liable to the plaintiff for any sum of money as minimum royalties under the license, or by reason of the guaranty of United Carbon Company, Inc., in the agreement of July 31, 1936, to pay "such expenses as Microid shall have incurred by order of its board of directors," followed by the resolution of Microid's board of directors of August 18, 1936, providing for the payment to plaintiff of $625 per month.

It will be noted that the premises on which the license agreement of July 31, 1936, from Microid Process, Inc., to United Carbon Company, Inc., were based are set forth in the preamble to that agreement. It is stated that "Microid is the owner of or has the right to grant licenses under certain inventions and discoveries relating to dispersions of finely divided solids," and that United "desires to acquire a license as hereinafter defined to practice said inventions or discoveries." It will be further noted that the master license from plaintiff to Microid Process covered "(a) The inventions, improvements or discoveries disclosed in the patents or applications therefor, more fully set forth in a schedule of such patents and applications attached hereto as Exhibit 'A';" and "(c) All inventions, discoveries or improvements relating to any idea, machine, apparatus, formula, fact or process pertinent or valuable to the science and art of pigment dispersions of whatever kind and nature heretofore or hereafter made, discovered, compiled or developed by de Stubner or with respect to which he has a right to grant a license." The same schedule was attached to both the main license and the sub-license. With the exception of two items listed on the schedule under the heading "Docketed but not Filed,"

which will be discussed later, all the patents and patent applications listed in the schedule, including the column heading "Docketed but not Filed," related to processes and methods claimed to be useful in the art of pigment dispersions. Moreover, the option which preceded the license agreements, and which is exhibited with the complaint as Exhibit "A," contains the same kind of preamble to the effect that plaintiff was the owner of patents and applications relating to apparatus, methods, processes, and products pertaining to the art of pigment dispersion, and that United Carbon Company was desirous of obtaining an option for an exclusive license thereon. The patents and applications referred to in the option were set out therein, and none of them had any relation to any other matter than the art of pigment dispersions.

Pigment dispersions are useful in such industries as the manufacture of paints, varnishes, printing inks, lacquers, cement, and other fields of manufacture where it is desirable to have uniformity of distribution of color. Dustless carbon black is not a pigment dispersion. It is the exact opposite. It is an aggregation of particles into solid pellets, which, when formed, consist of substantially pure carbon black. The purpose of manufacturing the carbon black in this form is to promote ease in handling and to avoid the dust which is present whenever carbon black is handled in an untreated form. While it may be used as a material from which dispersions are made, the fact that it is in dustless form does not add to its usefulness or value in the making of dispersions.

In my opinion there is no ambiguity in the license agreements. It is evident from the plain words thereof that the parties had no other intention than to agree upon the licensing of plaintiff's inventions and discoveries relating to dispersions of finely divided solids. If there were any ambiguity it should, in the light of the conduct of the parties in relation to the license, be resolved in favor of the defendants; for it is well settled that, in cases of ambiguity, that construction will ordinarily be given the contract which the parties themselves have acted upon in their dealings with rela-

tion to it. Butler v. Carlyle, 84 W.Va. 753, 100 S.E. 736; Osage Gas Co. v. Cleveland & Morgantown Coal Co., 101 W.Va. 675, 133 S.E. 388; Litz v. First Huntington National Bank, 120 W.Va. 281, 197 S.E. 746. I conclude, therefore, that the license agreement was restricted to the field of pigment dispersions and had no relation to that of dustless carbon black.

In the schedules attached to the license agreements, under the heading of "Docketed but not Filed," two disclosures are listed which do not relate to pigment dispersions. One of these is entitled "Manufacture of Dustless Carbon Black," and is referred to in the evidence as Disclosure E926. The other is entitled "Manufacture of Carbon Black," and is referred to as Disclosure E927. The plaintiff contends that the inclusion of Disclosure E926 in the list attached to the license agreements manifests an intent of the parties that the license should extend to the field of dustless carbon black. If this contention is to be given any weight, it must be by reference to the quoted Paragraph (a) of the master license in which it is set out that the license covers "The inventions, improvements or discoveries disclosed in the patents or applications therefor, more fully set forth in a schedule of such patents and applications attached hereto as Exhibit 'A'." E926 was neither a patent nor a patent application, but a mere disclosure. Therefore, it would not be included under the strict coverage of Paragraph (a). Furthermore, it was shown by the evidence to my satisfaction that at the time the license agreements were signed the lists attached thereto, or at least the list headed "Docketed but not Filed," had not been furnished to defendants; were not, in fact, furnished until long after the signing of the agreements; and the particular disclosure in question, E926, was not seen by any of defendants' officers or representatives until years after the papers were executed. This disclosure E926 purports to describe a method of producing dustless carbon black by a centrifugal dry process similar to that of dust collecting machinery. It bears not the slightest resemblance to any process then or afterwards used by defendants. It has never been successfully used by anyone, and it was shown by satisfactory expert testimony that the method described is entirely impractical and of no value. In my opinion, the inclusion of this disclosure in the list can have no bearing on the construction of the license agreements.

In deciding the last issue presented in this case, namely, whether plaintiff is entitled to recover any sum from the defendant United Carbon Company, Inc., either as minimum royalties under the license or pursuant to the resolution of Microid's directors on August 18, 1936, there are certain facts to be considered relative to the situation of the parties and the intention and construction of Paragraph 6 of the agreement between plaintiff and defendant United Carbon Company, Inc., already quoted, in the light of the subsequent resolution of Microid's directors. It must also be considered that plaintiff has heretofore been successful in certain litigation in the courts of West Virginia, as a result of which the Supreme Court of Appeals of West Virginia decided that plaintiff was entitled to recover the sum of $625 per month up to August 1, 1942, "in lieu of dividends," that being the date on which the Court's cancellation of the license from de Stubner to Microid became effective. De Stubner v. United Carbon Co., Inc., et al., 126 W.Va. 363, 28 S.E.2d 593.

When Microid Process, Inc., was formed, United, Inc., received two-thirds of its capital stock, and plaintiff received one-third. Plaintiff was employed as director of research for a term of five years. His stock was given priority as to payment of dividends to the extent of $7,500 the first year, and $12,000 per year thereafter. If he failed to receive these amounts, he was given the right to terminate his services as director of research. It was in this situation that Microid's directors on August 18, 1936, passed the resolution directing that $625 per month be paid to plaintiff "as per contract," without limitation as to the period of time covered by such payments.

It is contended by plaintiff that the payments of $625 per month were in the nature of a minimum royalty under the sub-license to United, Inc., and that the cancellation of the main license from plaintiff to Microid had no effect on these

payments, inasmuch as United, Inc., continued to hold the sub-license, with plaintiff substituted as licensor in the place of Microid. I can find no justification for this contention. An analysis of the sub-license to United, Inc., together with the other agreements on which the claim rests, reveals that no minimum royalty of any kind was provided for, but that royalties were to be paid on products made under the sub-license according to a rate which was not fixed therein, but which was to be later determined in the light of market conditions. The Court cannot go beyond the agreement of the parties and establish a minimum royalty where none was provided for by the parties themselves.

However, it is further contended by plaintiff that whether the payments be regarded as minimum royalties or otherwise, there remains an obligation on United, Inc., to pay him $625 per month up to the time United, Inc.'s sub-license was finally cancelled. There is a dispute between plaintiff and United, Inc., as to whether this final cancellation date was August 1, 1944, or August 1, 1945. Plaintiff argues that the liability was fixed by the decision of the Supreme Court of Appeals of West Virginia, giving him judgment for the monthly payments of $625 up to August 1, 1942. De Stubner v. United Carbon Co., Inc., et al., supra.

Since I have concluded that the monthly payments cannot be properly denominated as minimum royalties, the question arises as to what the consideration was for the original promise to pay these sums. They are called by the West Virginia Supreme Court of Appeals payments "in lieu of dividends." It seems to me from a reading of the agreement between plaintiff and Microid that his employment as director of technical research may also have some relation to these payments, since it is provided that if dividends on his stock should not amount to the fixed minimum per year, he was at liberty to terminate his employment as director of technical research, unless someone on Microid's behalf should pay him the difference.

However, considering the payments, as the West Virginia Court seems to have done, solely as payments "in lieu of dividends," I am unable to conceive how the obligation to make these payments could have extended beyond the cancellation of Microid's license. It was shown in evidence that immediately upon such cancellation plaintiff surrendered all stock which he owned in Microid. That company never afterwards transacted any business; it was insolvent at the time, although not formally dissolved until July 27, 1944. Its only substantial assets had been its right to the payment of royalties under the sub-license to United, Inc., and the license from plaintiff, which was cancelled by court decree at the suit of plaintiff himself. The loans and advances made to Microid by United, Inc., were far in excess of any possible royalties on products made under the sub-license. For all practical purposes the Microid corporation ceased to exist, and plaintiff, under no theory which occurs to me, could expect any dividends on stock which he had surrendered.

The obligation of United, Inc., to pay the $625 per month to plaintiff cannot, in my opinion, be put on any higher ground than that of a guaranty of Microid's primary obligation to pay plaintiff minimum dividends. Ordinarily, such a guaranty cannot impose a liability on the guarantor greater than that of the principal. Davies et al. v. Lahann et al., 10 Cir., 145 F.2d 656; Bourne v. Board of Sup'rs of Henrico County, 161 Va. 678, 172 S.E. 245; 24 Am.Jur. 922, Guaranty sec. 73; 38 C.J.S., Guaranty § 43, p. 1190 et seq.

By the terms of Paragraph 6 of the agreement of July 31, 1936, between plaintiff and United, Inc., the latter agreed to advance funds necessary to pay "such *expenses* as Microid shall have incurred by order of its board of directors." Only by treating the monthly payments of $625 as *expenses of Microid* can they be brought under the terms of the guaranty.

While the guaranty was to continue so long as United retained the right to use the sub-license, still, it could never be broadened to include any obligation not expressed in it. Therefore, unless we can say that the directors' resolution created an enforceable obligation on Microid to pay

the stated monthly sums to plaintiff *as an expense of Microid,* after August 1, 1942, then no liability subsequent to that time can be imposed on United.

The term "expenses" in the guaranty implies some useful or beneficial corporate purpose to be attained from the expenditure. So long as Microid retained the license from plaintiff, it had an asset of potential value. It might logically continue to expend money for the preservation of this potential asset. But after cancellation of the license by act of the plaintiff on August 1, 1942, no reason existed why Microid should continue to expend money with relation to it.

Furthermore, the resolution of Microid's directors provided that the $625 monthly payments be made to plaintiff "as per contract." Evidently this phrase refers to the license agreement which was cancelled as of August 1, 1942. It is the only contract between plaintiff and Microid which is shown to have existed at the time in which reference is made to such payments. The license agreement having been terminated by plaintiff's own act, Microid's obligation to make the payments to plaintiff was likewise at an end, and no further rights could accrue to plaintiff under the resolution.

I hold, therefore, that the resolution of Microid's board of directors on August 18, 1936, properly construed, did not bind Microid to make any payments of money to plaintiff after the cancellation of plaintiff's license to Microid, and that no such payments can be recovered from United Carbon Company, Inc.

In view of this conclusion, it is unnecessary to decide the question of when the sub-license to United Carbon Company, Inc., was actually cancelled.

I therefore make the following findings of fact and conclusions of law:

## Findings of Fact.

1. Plaintiff did not at any time give any information to defendants or either of them or any of their agents which was useful to, or which was later used by them in the production of dustless carbon black.

2. Plaintiff did not make any disclosures at any time to the defendants or either of them or any of their agents with reference to the subject of dustless carbon black, other than disclosure E926.

3. Disclosure E926 was not made to any of defendants' representatives until long after the agreements of July 31, 1936, were signed.

4. Disclosure E926 relates to an impractical and therefore useless method of making dustless carbon black. None of defendants' processes which they have ever used, or which are being used, bears any relationship to the process disclosed in disclosure E926.

5. None of plaintiff's patents, patent applications or disclosures other than disclosure E926 relate to any process, method or apparatus for making dustless carbon black.

## Conclusions of Law.

1. The sub-license agreement between Microid Process, Inc., and United Carbon Company, Inc., relates solely to the science and art of pigment dispersions, and is not broad enough to cover any process, method or apparatus for making dustless carbon black.

2. Defendants are not liable to the plaintiff in any sum for royalties on the production of dustless carbon black under the sub-license agreement.

3. Defendants are not liable to plaintiff on any quantum meruit theory to pay him any sum of money based on their production of dustless carbon black, because plaintiff has failed to prove that he ever communicated to defendants any useful information relative to any process, method or apparatus for the production of dustless carbon black.

4. Defendants are not liable to plaintiff in any sum, either as minimum royalties, payments in lieu of dividends or otherwise, by reason of the, provisions of Paragraph 6 of the agreement of July 31, 1936, between plaintiff and defendant United Carbon Company, Inc., followed by the resolution of the directors of Microid Process, Inc., of August 18, 1936.

From statements made by counsel on both sides of this case in the concluding argument, it is not clear to me whether or not it should be retained for the purpose of determining what, if any, actual royal-

ties may be due the plaintiff by reason of United, Inc.'s production of pigment dispersions during the time the sub-license was in force. It was apparent to me from the evidence that advances made by United Carbon Company, Inc., were far in excess of any possible royalties; but counsel may after conference indicate to me their views in this regard, and should it appear that an inquiry into the subject of actual royalties on pigment dispersions is necessary, it will be made.

Otherwise, in accordance with the conclusions above announced, the complaint will be dismissed and an order may be entered to that effect.