**SUPERIOR TESTERS, INC., Plaintiff,**

v.

**DAMCO TESTERS, INC.; Brown Oil Tools, Inc.; D. A. Miller; Frank J. Lofaso; Claudia Deal; H. Robert Cournoyer; Ray O. Tillett; William J. Bergeron; James A. Lightfoot, Jr.; and Ellis O. Deal, Defendants.**

**Civ. A. No. 69–726.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 15, 1970.

■■■■■■■■■■■■■■■■■■

A. J. Gray, III, New Orleans, La., Harvey B. Jacobson, Jr., Washington, D. C., H. Minor Pipes, Houma, La., for plaintiff.

Gerald F. Lofaso, Houma, La., Carlos A. Torres, Houston, Tex., for defendants.

Philip J. McMahon, Houma, La., Charles A. Keilin, Houston, Tex., for defendant Brown Oil Tools, Inc.

RUBIN, District Judge.

Superior Testers, Inc. (Superior) seeks an injunction on the grounds that Damco Testers, Inc. (Damco) and certain of its officers, directors, and stockholders are violating Superior's exclusive patent license by making and using pipe testing equipment in Louisiana and are unfairly competing with Superior. The sole basis asserted for jurisdiction is 28 U.S.C. § 1338 [1] and Superior's allegation that the suit arises under the patent laws of the United States.

While the amended complaint asserted a claim for patent infringement, the defendants' answers, and the evidence introduced at the factual hearing on the plaintiff's motion for a preliminary injunction, taken together dispose of any issue in that regard: the crux of their dispute is Superior's claim that it has an exclusive franchise for the states of Louisiana and Mississippi and the offshore areas contiguous to those states and that Damco, the assignee of the patents, is violating that franchise by making the patented equipment in Louisiana and using it offshore from the Louisiana coast. When this became apparent, the court requested memoranda with respect to its jurisdiction.

## I. JURISDICTION

Whether a federal court has jurisdiction of a matter depends on the well pleaded allegations of the complaint. 1 Moore's Federal Practice ¶0.60 [8.–7]; Wright, Federal Courts § 18 (1963). This rule is known as the "four corners" rule because jurisdiction is determined from the four corners of the complaint without regard to other pleadings or facts later developed on the merits. "Where jurisdiction is based on the existence of a federal question, the jurisdictional allegation should state that the action arises under a particular statute or provision of the Constitution * * * and the body of the complaint must state facts showing that the case does in fact arise under federal law." Wright, *supra* at § 69, page 254. Unless the plaintiff attempts to invoke federal jurisdiction fraudulently, or in bad faith, or by frivolous allegations, jurisdiction must be determined when the complaint is filed, and by the allegations made in it, for jurisdiction does not of course depend on whether the plaintiff ultimately prevails. Mosher v. City of

---

1. "(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases.

"(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws. June 25, 1948, c. 646, 62 Stat. 931." 28 U.S.C. § 1338.

Phoenix, 1932, 287 U.S. 29, 53 S.Ct. 67, 77 L.Ed. 148; Iselin v. LaCoste, 5 Cir. 1945, 147 F.2d 791. Thus federal jurisdiction is determined by the way the complaint is drawn, except where the claim of federal jurisdiction is "immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Bell v. Hood, 1946, 327 U.S. 678, 682–683, 66 S.Ct. 773, 776, 90 L.Ed. 939. Guided by the foregoing principles we begin by examining the portions of the amended complaint [2] that allege jurisdictional facts.

The amended complaint starts by asserting, "This is an action for patent infringement, for specific performance and violation of an exclusive patent license agreement, and for unfair competition." The allegations relating to patent infringement are set forth in Count I. These paragraphs of the amended complaint (numbered 7 through 19) allege that Superior is in the business of pressure testing tubing and casing used in the oil industry. One of the defendants, Brown Oil Tools, Inc. (Brown), was the owner of three patents; Superior purchased certain pipe testing equipment from Brown and entered into a license agreement with Brown on February 1, 1966, and a copy of the Bill of Sale and license agreement is attached; subsequently the license was amended and Superior obtained a license from Brown that was exclusive for the States of Louisiana and Mississippi, even as against Brown. Between February 1, 1966 and February 28, 1969 Superior paid Brown over $30,000 in royalties for its exclusive rights.

The amended complaint then recites that on February 25, 1969, Damco purchased Brown's rights in the patents "subject to the exclusive license of" Superior; a copy of the assignment from Brown to Damco is attached. Superior reasons that by virtue of these agreements it "has been and is presently the owner of the entire right, title and interest in and to the subject matter of said Patents * * * for the States of Louisiana and Mississippi and is vested with full power to seek an injunction and damages against infringement of said patents within the States of Louisiana and Mississippi." (Paragraph 24)."

The amended complaint then alleges that the individual defendants formed Damco to compete with Superior in Louisiana and Mississippi and that Damco has manufactured and used the patented equipment within the State of Louisiana. There follow various allegations concerning the part each of the defendants (other than Brown) is alleged to have played with respect in each case to infringing the patents and Superior's exclusive rights thereunder.

Nowhere in the amended complaint is there a charge merely of patent infringement. The complaint focuses on the charge that the conduct of the defendants was an infringement of the patents and "the exclusive rights of Superior thereunder."

In its amended complaint Superior prays for an injunction against further infringement by all of the defendants, except Brown, of its exclusive rights under the Brown patents within the States of Louisiana and Mississippi. Superior also seeks treble damages "arising out of infringement" of the patents by the defendants.

In Lang v. Patent Tile Company, Inc., 5 Cir. 1954, 216 F.2d 254, the Fifth Circuit Court of Appeals was asked to construe an instrument denominated an "assignment" of an interest in a patent. The plaintiff's complaint alleged that "a proper interpretation of [the instrument]" was that the plaintiff acquired the "exclusive right to build and construct" the patented machines, "to sell or lease said machines and to license others to use said machines." 216 F.2d 255 n. 1. The complaint further alleged

---

**2.** Since the amended complaint is complete in itself and makes no reference to nor adopts any portion of the original complaint it supersedes the original complaint. 3 Moore's Federal Practice ¶ 15.-08 [7] and cases cited in n. 1 at 939.

that the defendant's position was that the exclusive right transferred "was no more than a license. There is an actual controversy between the parties concerning the interpretation of the * * * assignment, * * *." *Id.* Part C of the prayer sought an injunction against infringement of the plaintiff's patent rights. The court found that "The primary and controlling purpose of the complaint was to secure an interpretation of the [exclusive franchise]. The prayers for injunction and for damages are conditioned on securing an interpretation of the [franchise] favorable to he plaintiff. Questions under the patent laws may arise in the course of the litigation, but this is not a case arising under those laws."[3] 216 F.2d at 255. The Fifth Circuit remanded with directions to dismiss the complaint for lack of subject matter jurisdiction.

The opinion in *Lang* does not discuss two Supreme Court decisions that must also be taken into account here. In Excelsior Wooden Pipe Company v. Pacific Bridge Co., 1901, 185 U.S. 282, 22 S.Ct. 681, 46 L.Ed. 910, a licensee who claimed an exclusive license sued the patentee who was its licensor, together with a third person who had been granted a later license. The licensor's defense was based on alleged revocation of the plaintiff's license. The Supreme Court maintained jurisdiction. It distinguished Wilson v. Sandford, 1850, 10 How. 99, 51 U.S. 99, 13 L.Ed. 344, which was relied on in *Lang*, because *Wilson* involved a suit by the licensor to set aside the license on the ground that the licensee had not complied with the terms of the license. It said the present suit differed from an ordinary infringement "only in the fact that the suit is by a licensee against two defendants, one of whom is the licensor and owner of the patent, and the license is set forth only for the purpose of determining title." The jurisdictional question arose only because the answer admitted the validity of the patent and made revocation of the license the sole issue.

The *Excelsior Wooden Pipe Container* decision cites and relies on Littlefield v. Perry, 1874, 88 U.S. (21 Wall.) 205, 22 L.Ed. 577, where jurisdiction of a suit by a licensee against his licensor was maintained. The court had there observed:

"[The plaintiffs] certainly had the exclusive right to the use of the patent for certain purposes within their territory. They thus held a right under the patent. The claim is that this right has been infringed. To determine the suit, therefore, it is necessary to inquire whether there has been an infringement, and that involves a construction of the patents. * * * Such a suit may involve construction of a contract as well as the patent, but that will not oust the court of its jurisdiction. If the patent is involved, it carries with it the whole case.

"A mere licensee cannot sue strangers who infringe. In such cases redress is obtained through or in the name of the patentee or his assignee. Here, however, the patentee is the infringer, and, as he cannot sue himself, the licensee is powerless, so far as the courts of the United States are concerned, unless he can sue in his own name. A court of equity looks to substance rather than form. When it has jurisdiction of parties it grants the appropriate relief without regard to whether they come as plaintiff or defendant. In this case the person who should have protected the plaintiff against all infringements has become himself the infringer." 88 U.S. (21 Wall.) at 222–223, 22 L.Ed. at 579.

The Seventh Circuit Court of Appeals has interpreted *Excelsior* as controlling a similar question in James C. Wilborn & Sons, Inc. v. Brandex Tilt Sash, Inc., 7 Cir. 1967, 380 F.2d 44. The court said

---

3. Compare the decision in Industrial Synthetics Corp. v. Swan Rubber Co., 5 Cir. 1956, 234 F.2d 819, which is consistent with *Lang*.

that "the only issue raised" in *Excelsior* "was whether the exclusive license was in existence." 380 F.2d at 47. The court concluded that the significance of *Excelsior* was:

"Thus, if the allegations of a complaint and the relief requested state a claim for patent infringement, the suit is one arising under the patent laws, and the jurisdiction of the district court is not defeated even though the defendant raises no issue other than the plaintiff's contract rights under the patent." *Id.*

Several consistent decisions are cited in *Wilborn*, though *Lang* is not mentioned. See particularly McKnight v. Akins, 6 Cir. 1951, 192 F.2d 674.

The defendant's motion to dismiss relies in part on T. B. Harms Company v. Eliscu, S.D.N.Y.1964, 226 F.Supp. 337, but that decision was bottomed on the finding that no acts of infringement had been shown to exist. That case, like Muse v. Mellin, S.D.N.Y.1962, 212 F. Supp. 315 does indeed follow the same rationale as *Lang* and considers the underlying facts to determine jurisdiction. Like *Lang* it does not mention either

*Excelsior* or *Littlefield*.

The reasoning of Judge Hubert Will in American Dairy Queen Corp. v. Augustyn, N.D.Ill.1967, 278 F.Supp. 717, 720, is apposite:

"Since jurisdiction is to be determined solely on the basis of the allegations in the complaint, it could not be defeated by the defendants' assertions in their answer. The result should be no different in this case. Jurisdiction is not defeated simply because the plaintiff has anticipated a defense based on state law and has not only alleged trademark infringement but has sought a determination of the entire controversy." (Citations omitted).

"It is true that the plaintiffs could institute a suit for specific performance of the sub-franchise agreement in the state courts and receive the same relief which they seek here. It does not follow, however, that they must rely solely upon a state court suit on the franchise for any relief. In analogous situations, where a plaintiff has had a choice between relying upon federal law for copyright or patent infringement and state law for breach of contract, it has been held that the plaintiff could base his claim on federal law and invoke federal jurisdiction." (Citations omitted).

■ The well pleaded allegations of Superior's amended complaint and the relief requested state a claim for patent infringement. Superior alleged that the rights it obtained under its "exclusive license" from Brown amounted to an assignment of all of Brown's rights under the patents in the States of Louisiana and Mississippi, not merely a license to use the invention. While this claim is made with the zeal of advocacy, it is made in good faith.

■■ The name by which an instrument is called is significant as showing the intention of the parties, but it is not controlling; whether a transfer of an interest under a patent amounts to an assignment or a license depends on the effect of the whole agreement and the legal results flowing from its provisions. E. W. Bliss Co. v. United States, 1920, 53 Ct.Cl. 47, aff'd, 253 U.S. 187, 40 S.Ct. 455, 64 L.Ed. 852; Waterman v. Mackenzie, 1890, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. When the agreement contains ambiguities, extrinsic evidence must be considered to construe it properly. American Radiator Co. v. Foster, 6 Cir. 1938, 98 F.2d 135, 136; Container Patents Corp. v. Stant, 7 Cir. 1944, 143 F.2d 170, 172. As an incident of the alleged assignment Superior asserts the right to sue in its own name for an injunction and for damages against infringement in Louisiana and Mississippi, even as against Brown, the licensor-owner, and Damco, Brown's assignee. The claim of infringement was substantial; it was made in good faith and was

not frivolous. As in *Wilborn, supra,* "[The plaintiff] put in issue [its] title to the [Brown] patents, the validity of the patents, and the infringement of them. In support of their rights under the patents [it has] alleged facts which, if established, entitle them to enforce the patents against the defendants." 380 F. 2d at 47. We find here, as the court did there, that, "The case is therefore one arising under the patent laws, notwithstanding the defendants' assertion that the existence or nonexistence of an exclusive license under the patents is the only contested issue." *Id.* Compare, Luckett v. Delpark, Inc., 1926, 270 U.S. 496, 46 S.Ct. 397, 70 L.Ed. 703.

The cases relied upon by the defendants do not sufficiently take into account the principles underlying the four corners rule. The importance of determining jurisdiction by the well pleaded allegations of the complaint is demonstrated here. No question of the court's jurisdiction was raised by the parties. The issue arose only when the court called it to the parties' attention after the trial on the motion for a preliminary injunction. If jurisdiction is now denied because the facts show that the true controversy between the parties is different from the one framed by the complaint, a new trial in state court would be necessary. Nor could it be predicted when the complaint was filed that no patent issue would be raised. While Damco might ultimately have been held estopped to deny the validity of the patent, it might have asserted its invalidity as a defense. Or it might have chosen to put the scope of the patent at issue by contending that what it was doing did not constitute an infringement. Nor is it controlling that the cause of action upon which jurisdiction depends is determined to be without merit. So far as foresight could test, there was jurisdiction when the complaint was filed, and it still exists. We now speak of the ultimate legal disputes between the parties with the certainty of their nature given by hindsight.

## II. FINDINGS OF FACT—PATENT INFRINGEMENT ISSUE

### A. BACKGROUND

Superior is a Louisiana corporation; its President is Lee A. Matherne. Matherne and his wife were two of the three original corporate directors, and they own 12/22 of its outstanding stock. The other stockholder, and the third original director, is Darwin A. Miller, who owns 10/22 of Superior's stock.

Before February 1, 1966, Brown was in the business of pressure testing pipe used to drill oil and gas wells. Miller worked in Brown's Houma, Louisiana, office and was in charge of Brown's pipe testing operations in Louisiana and Mississippi. Brown wanted to sell its patented pipe testing equipment and get out of the pipe testing business. With Matherne's financial support, Miller arranged to purchase the equipment and to get a license for its use.

Superior was therefore organized as a Louisiana corporation in January, 1966. On or about February 1, 1966, Superior and Brown executed an agreement entitled, "Bill of Sale." It conveyed certain pipe testing and related equipment (such as vehicles to transport the equipment), and one incomplete pipe testing unit; it also granted Superior what was termed merely a "non-exclusive license" under three Brown patents. The scope of the license was not further defined. Superior was to pay Brown a royalty of "1½% of the amount Superior receives from the testing of pipe which is covered by [the Brown] patents." Brown ceased to engage in pipe testing in Louisiana and Mississippi, and Superior began to engage in that business. In addition to the equipment bought from Brown, Superior bought similar equipment from Miller and began manufacturing pipe testing equipment of the kind covered by the patent. It also completed the partially finished unit it had bought from Brown. Its business soon became highly profitable.

Soon after Superior began business, Matherne asked its attorney to review the Bill of Sale. The lawyer called attention to the fact that the license was nonexclusive. Matherne then requested an exclusive license from Brown. Joe Brown, Brown's president, told Matherne that Brown did not intend to license any other users in Louisiana and Mississippi.

Superior contends that an oral agreement for an exclusive license was made with Brown in 1966, but the evidence is convincing that Brown deliberately refrained from making any such agreement. His company had entered into 65 license agreements between 1965 and 1968, and many before 1965. It had never granted an exclusive license. However, during 1968, Brown decided that, since Matherne was concerned about the extent of his license, he ought morally to give Superior a license that would protect the company from other users in Louisiana and Mississippi.

In November, 1968, Matherne and Miller disagreed about Miller's management of Superior's operations. Matherne took over active management. Other disagreements arose, and, in December, Matherne sent a message to Miller that, if he did not respond to Matherne within a certain time, his salary would be suspended. Miller did not communicate with Matherne, so Matherne caused Superior to stop his salary.

At a social gathering in Houma, on December 23, 1968, one or more of the guests who had become aware of the differences between Matherne and Miller indicated an interest in joining Miller in any future business. The next day Miller began efforts to organize a new business. By December 27, Damco's articles of incorporation had been prepared, and defendants Miller, Deal, Lofaso and Cournoyer had signed them.

Damco opened an office approximately one mile from Superior's principal office in Houma, Louisiana. It set out immediately to build equipment that was sub-stantially identical to the equipment of Superior, including identical testing tools. It bought supplies from substantially the same suppliers that Superior used, and began to solicit business from Superior's customers.

After learning that Damco had been formed, Matherne became concerned about its competition. Matherne and his attorney contacted Joe Brown by telephone several times in an effort to obtain an "exclusive license." Finally, on January 15, 1969 Matherne went personally to Brown's office in Houston and obtained a letter stating, "You [Superior] have an exclusive license in the states of Louisiana and Mississippi under the following patents: * * *."

Superior immediately advised Damco, by letter dated January 17, 1969, of its exclusive license under the Brown patents for Louisiana and Mississippi. Thereupon, counsel for Damco wrote to Brown. Brown replied by letter dated January 28, 1969 which advised of the oral agreement granting Superior an "exclusive license" for the States of Louisiana and Mississippi and the confirmation of the oral agreement by the letter dated January 15, 1969.

Damco then sought to circumvent Superior's exclusive license by purchasing the three Brown patents. The Agreement dated February 25, 1969 specifically recites that Brown "transfers to DAMCO that certain non-exclusive license under said Letters Patent granted by BROWN to Superior Testers, Inc. * * * as embodied in a Bill of Sale dated February 1, 1966 * * *; said non-exclusive license having subsequently been made exclusive for the states of Mississippi and Louisiana by a certain letter dated January 15, 1969 * * *."

## B. SCOPE OF SUPERIOR'S LICENSE

The operative language of the Bill of Sale has already been quoted. It says merely that Superior "shall have a non-exclusive license." Similarly, the letter

that is relied upon for an exclusive license states that Superior has "an exclusive license in the states of Louisiana and Mississippi" under the Brown patents.

The word "license" is not a self defining, self delimiting term. It implies of course "leave to do a thing which the licensor would otherwise have a right to prevent," [4] but this does not necessarily mean, as Superior urges, that use of the simple word "license" gave Superior a franchise to exercise every right granted Brown by the patent.

■ ■ Since the agreement is not clear, we must seek extrinsic evidence to find out what the parties meant by the word they did not further define. The fact that Brown's lawyer prepared the agreement must be taken into account,[5] as well as the rule that a patent license agreement is ordinarily construed against the licensor and in favor of the licensee.[6]

■ But the conduct of the parties is itself evidence of their own interpretation of the contract. American Radiator Co. v. Foster, 6 Cir. 1938, 98 F.2d 135, 136; Container Patents Corp. v. Stant, 7 Cir. 1944, 143 F.2d 170, 172; De Stubner v. United Carbon Co., S.D. W.Va.1946, 67 F.Supp. 884, 891–892.

When a prospective purchaser sought to buy pipe testing equipment from Superior, Miller, then its vice-president and general manager, referred the purchaser to Brown. Superior made pipe testing equipment only for its own use. It used the equipment in Louisiana and Mississippi. It made some visits outside these states to solicit pipe testing business, but virtually all of its actual testing was in Louisiana, Mississippi and in the area off Louisiana's coast. It paid royalties to Brown in the same amount whether its receipts were from testing

pipe within the geographic boundaries of these states or offshore.

■ A patent grants the patentee "the right to exclude others from making, using, or selling the invention throughout the United States * * *." 35 U.S.C. § 154. When the patentee grants a license, he remains owner of the patent. Waterman v. Mackenzie, 1890, 138 U.S. 252, 11 S.Ct. 334, 34 L. Ed. 923. The word "license" does not in itself define whether the licensee is to have all of the patentee's rights, and the addition of a restrictive adjective, "exclusive license" does not clarify the word in this regard. The use of the word "license" and the context that surrounds it in the Bill of Sale indicate that the Bill of Sale was not intended to be an assignment of the whole patent or of title to it, nor was it intended to be a partial assignment of the right to use the invention in the states of Louisiana and Mississippi.

For, as stated in McClaskey v. Harbison-Walker Refractories Co., 3 Cir. 1943, 138 F.2d 493, 499:

"The assignment of a patent must be in writing to fulfill the requirements of the federal statute. Though no particular form of words is required the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent."

*Accord*, Kenyon v. Automatic Instrument Co., 6 Cir. 1947, 160 F.2d 878, 882. *See also*, Switzer v. Commissioner of Internal Revenue, 6 Cir. 1955, 226 F.2d 329, 330; Evans v. Kavanagh, E.D. Mich.1949, 86 F.Supp. 535; Lamar v. Granger, W.D.Pa.1951, 99 F.Supp. 17, 36.

The evidence indicates that Superior never obtained and was never given the right, exclusively or otherwise, to *sell*

4. Western Electric Co. v. Pacent Reproducer Corporation, 2 Cir. 1930, 42 F.2d 116, 118.

5. Krantz v. Van Dette, N.D.Ohio 1958, 165 F.Supp. 776, 779; Lewis Invisible Stitch Mach. Co. v. Popper, E.D.N.Y. 1940, 33 F.Supp. 812, 813.

6. Ruckstell Sales & Mfg. Co. v. Perfecto Gear Differential Co., S.D.Cal.1928, 28 F.2d 407, 411.

the equipment covered by the subject patents. The word "sell" does not appear in the initial Option Agreement, the Bill of Sale agreement or the letter of January 15, 1969 and the testimony indicates there was never any oral agreement specifically giving Superior any right to sell the patented equipment.

Superior never bargained for or received the express right to *make* equipment covered by the subject patents. Superior has made equipment, but it apparently considered that it had merely an implied right to make any equipment required for its own use. Had Brown intended to grant Superior the right to make and sell equipment to others, it would likely have reserved some royalty on such sales, or incorporated some provision with respect to payment of royalties to it by the vendees.

The term "exclusive license" employed in the letter of January 15, 1969 was intended by Brown to protect Superior in accordance with Brown's prior oral statement that it did not intend to license others to use the patented equipment in the states of Louisiana and Mississippi. Neither the letter of January 15, 1969 nor any prior oral or written agreement excluded Brown from making or selling the patented equipment in Louisiana and Mississippi.

■ Superior therefore received an exclusive license to use the invention in Louisiana and Mississippi. Since there was no reservation in the agreement by Brown, the exclusiveness of the license applies to Damco, its assignee, as well insofar as use is concerned. No express term is set forth in the agreement and the parties offered no evidence on this subject. Since a decision concerning the duration of the agreement is not necessary to the present decision, I pretermit discussion of the question.

### C. GEOGRAPHIC AREA

■ The evidence taken as a whole convinces me that when Brown and Superior used the geographic terms "Louisiana and Mississippi" in the exclusive license letter, they meant to include the offshore area. Most of Brown's pipe testing work had been done in connection with offshore operations; so had most of Superior's. Royalties had been paid on pipe testing work done for offshore wells. The word "Louisiana" was not used in their agreement in the technical sense of the area already determined by law to be in Louisiana's coastal boundaries, or in the sense of the area [as yet unknown] that may ultimately be found to be a part of the State's territory. See, United States v. State of Louisiana, 1969, 394 U.S. 11, 89 S.Ct. 773, 22 L.Ed.2d 44, and, 1960, 363 U.S. 1, 121, 80 S.Ct. 961, 4 L.Ed.2d 1025, 1096. It was used to define the area defined by their prior business dealings as "Louisiana;" this meant offshore as well.

Hence I find that Superior's exclusive license embraces the area off Louisiana and Mississippi shores and that Damco should be enjoined from using the Brown pipe testing equipment there.

### D. ACCRUED ROYALTIES

This being determined, there is no reason why Superior should not pay all accrued royalties as well as future royalties to Damco. There is no proof whatever that Brown violated any duties it owed Superior. Having granted Superior a license, it properly reserved Superior's rights when it assigned the patent to Damco. There will be judgment dismissing Brown.

### E. INDIVIDUAL DEFENDANTS

■ With respect to all of the individual defendants other than Miller, there is no evidence that any of the individual defendants violated any duty they owed Superior. They did not conspire to violate any agreement between Superior and Damco. As investors they purchased corporate stock. The corporation had a reasonable amount of capital stock, and was not a mere sham. It had a bona fide dispute about contractual interpretation with Superior, and the court has determined that Superior's

version of the agreement is substantially correct. The corporation, Damco, does owe damages for its actions but there is no reason to set aside the corporate entity and mulct the stockholders and directors.

 There remain for final determination the charges by Superior that Miller violated his fiduciary obligations to the corporation and Miller's attempted counterclaim as a stockholder derivative action against Matherne. These questions are closely related. They must all be determined by Louisiana law. They involve only Louisiana residents and Louisiana corporations. A Louisiana court is the appropriate forum for their determination.[7]

Nonetheless in order that matters may remain in status quo pending a determination of these questions, the injunction will also provide that Matherne's total compensation from Superior is to be reduced to $12,000 a year; he is to be reimbursed actual expenses incurred in the business only, and only those properly deductible for federal income tax purposes; all corporate expenditures are to be by check; and all checks are to be countersigned by Frank J. Lofaso, as nominee of Matherne; should any disputes concerning business matters arise the court will appoint an arbiter and Matherne is to pay no salaries or compensation to any member of his family except a salary to his brother Carroll Matherne in the amount of $925.00 per month. This portion of the injunction will be vacated as soon as a Louisiana court assumes jurisdiction of the matter either by issuing an injunction or denying one.[8]

A judgment of dismissal will be entered as to all parties except Damco, and

a hearing on the claim for damages against Damco is set for February 2, 1970, at 9:00 A.M. On January 14, 1970, at 10:00 A.M. the court will consider whether a Special Master should be appointed to make that determination.

This opinion will serve in lieu of findings of fact and conclusions of law.

---

7. Since Superior acquired merely a license rather than an assignment or partial assignment of rights under the patents, it is possible that this court does not have jurisdiction of these issues under 28 U.S.C. § 1338(b). In addition it would clearly be unjust to decide Superior's claims of unfair competition against Damco and Miller, without considering Miller's derivative action against Superior—an action that is not within this court's jurisdiction.

8. An order granting this injunction was entered by the court on December 18, 1969, for written reasons to be later assigned.